Delaware, &c., R. R. Co. v. Central Stock-Yard Co.

## THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY

*v.*

## THE CENTRAL STOCK-YARD AND TRANSIT COMPANY.

1. Where one corporation seeks judicial redress against another corporation on the ground that the other has refused to give a service, or to perform a duty which it owes, the complaining corporation, to succeed, must show, affirmatively, that the service or duty which it claims exists by force of a statute, or a contract, or a usage having the force of law.

2. Unless a duty has been created against a corporation by usage, or by contract, or by a statute, the courts cannot be called on to give it effect.

3. A court of chancery is not, any more than is a court of law, clothed with legislative power. It may, in cases where no adequate remedy at law exists, enforce, in its own appropriate way, the specific performance of an existing legal obligation, arising out of contract, law or usage, but it cannot create the obligation.

4. The business of a stock-yard corporation, except in the character of the property which is the subject of bailment, corresponds, in many respects, with the business of warehousemen.

5. A warehouseman cannot have the possession of another man's property, with its accompanying duties and responsibilities, forced upon him against his will.

6. The legislature has power to declare what service warehousemen shall render to the public, and to fix the compensation that may be demanded for such service, but until such power is exercised warehousemen are at liberty to use their warehouses as they please.

7. The presence in the defendants' charter of a provision authorizing them to make contracts with the several railroad companies having a terminus in Hudson county, for the transportation and delivery of live-stock at their yards, shows clearly that the legislature did not intend that the defendants should be subject to any duty to railroad companies, in that respect, except such as they should voluntarily take upon themselves by contract.

8. To justify the interference of a court of equity on the ground that its interference is necessary to prevent irreparable damage, the complainant's legal right must be clear. There can be no damage, irreparable or otherwise, where there is no violation of a right.

9. Where the only ground laid to support the jurisdiction of a court of equity is that the defendant is violating a legal right of the complainant, to his irreparable injury, the complainant, to be entitled to the aid of the court, must show that his adversary's conduct is unconscientious.

Delaware, &c., R. R. Co. v. Central Stock-Yard Co.

On final hearing on bill and answer and proofs taken in open court.

*Mr. Flavel McGee* and *Mr. Joseph D. Bedle*, for the complainants.

*Mr. Leon Abbett*, for the defendants.

VAN FLEET, V. C.

The complainants allege that the defendants have refused to perform a legal duty which the defendants owe to them, and they bring this suit to procure a decree compelling the performance of such duty.

The complainants have control of a continuous line of railway from Hoboken to Buffalo, with connections at Buffalo extending to Chicago and other points in the West. They do a very large business in the transportation of live-stock, their income for carrying this kind of freight exceeding a half a million of dollars a year. The defendants are a stock-yard corporation, having yards and other facilities at the foot of Sixth street, in Jersey City, for the safe-keeping, feeding, sale and slaughter of live-stock. Their yards front on the Hudson river, where wharves have been built for the reception of live-stock carried to the yards by vessel. The eastern terminus of the complainants' road is at Hoboken, distant about sixteen hundred feet from the defendants' yards. There is no connection between the complainants' road and the defendants' yards by railroad track or other physical means. There are three different ways or means by which live-stock may be taken to the defendants' yards: First, it may be driven there over the public highway; second, both the Erie Railway Company and the Pennsylvania Railroad Company have laid tracks from the line of their roads to the defendants' yards, over which cars containing live-stock are run to the yards; and, third, live-stock may be carried to the defendants' yards by vessel and delivered on their wharf. For more than two years prior to the 15th of July, 1887, nearly all the cattle, calves and sheep, carried by the complainants to the

Delaware, &c., R. R. Co. v. Central Stock-Yard Co.

eastern terminus of their road, were transferred to the defendants' yards, in the complainants' cars, over the track of the Erie Railway Company, the cars being switched from the complainants' road to the Erie track at the junction of the two tracks. On the date last named, the Erie company increased their charge for this service from $2.50 and $3 a car to $5 a car. The complainants, being unwilling to pay the increased rate of charge, made an arrangement for the same service with the Susquehannah Railroad Company, who were at that time using the track of the Pennsylvania railroad running to the defendants' yards. After the lapse of about a month, the Pennsylvania company refused to allow the complainants to have the use of their track. The complainants then applied to the defendants to either send their boats to Hoboken for such stock as the complainants might desire to have yarded at the defendants' yard, or to allow the complainants to send, in their own boats, to the defendants' yards such stock as the complainants might desire to have yarded there. The defendants refused to do either. They refused to send their boats for complainants' stock, or to receive stock brought to their wharf by the complainants' boats. The reason the defendants refused to comply with the complainants' request was because the complainants had, prior to the time the request was made, refused to conduct their live-stock business in such manner that all cattle, calves and sheep, which they carried to Hoboken, should be yarded at the defendants' yards. Prior to the 14th of June, 1887, nearly all the cattle, calves and sheep, carried by the complainants to Hoboken, had either been yarded at the defendants' yards, or the same yard charges paid to the defendants on them that would have been payable if they had, in fact, been yarded there. About the date last named, the complainants made an arrangement by which the live-stock carried over their road for delivery at a stock-yard at Forty-fifth street, on the East river, should be transferred by their own boats directly from Hoboken to the point of delivery. This arrangement diverted from the defendants' yards all the stock so transferred, and deprived them of the profit which they would have otherwise received from it.

Delaware, &c., R. R. Co. *v.* Central Stock-Yard Co.

The diversion of this business was regarded by the defendants as a hostile act, and they at once assumed an unfriendly attitude towards the complainants. They at once gave notice, by their acts, that they intended to stand upon their strict legal rights, and to yield nothing to the complainants which the law did not give. This was, unquestionably, the origin of the present controversy. Immediately after the complainants had been notified that the defendants would neither send for such stock as the complainants desired to have yarded in the defendants' yards, nor allow it to be brought to their wharf in the complainants' own boats, the complainants filed the bill in this case, asking for an injunction compelling the defendants to receive live-stock from them. A preliminary injunction was refused (*Delaware, Lackawanna & Western R. R. Co.* v. *Central Stock-Yard Co., 16 Stew. Eq. 71*), and this ruling was affirmed, on appeal, by a divided court. *Id. 605.*

The case has been heard on final hearing, and is now to be decided on its merits. The claim of the complainants is, that the defendants are under a legal obligation to take from them just such live-stock as they may desire to have yarded at the defendants' yards, whether the same be sent to the defendants on foot, by rail or by boat; and also that it is the duty of this court to enforce this obligation by injunction. The proofs show that the defendants have never refused to receive stock from the complainants when the same was sent on foot or delivered by rail. At present, however, the complainants cannot have stock carried to the defendants' yards by rail. They have no track of their own, and they have been denied the use of the Pennsylvania track, and have ceased to use that of the Erie, because they are not willing to pay the rate which they have been notified will be charged for its use. But the particular way or method of delivery is rendered wholly immaterial by the defendants' answer. They deny that they are under any duty or obligation to the complainants, let the method of delivery be what it may, to take live-stock from them. The following are the pertinent averments of their answer:

Delaware, &c., R. R. Co. *v.* Central Stock-Yard Co.

" These defendants have and do refuse to receive, except under the command of an injunction, any live-stock transported over the road of the complainants, and consigned to shippers doing business at the defendants' yards, so long as the complainants persist in diverting from the defendants' yards at least nine-tenths of the complainants' cattle business; and they are advised and insist that they have a right so to do."

Again :

" These defendants admit that it is their intention to prevent the transportation to their yards of any live-stock coming over the complainants' railroad, unless the complainants are willing to give to the defendants all their business, the same as other railroads do ; and they are advised and insist that they have a right so to do."

Further :

" These defendants also say that they never have made, and do not intend to make, any objection to yarding live-stock which has been delivered to consignees on the line of complainants' road and driven to their yards."

From these averments, it will be seen that the material matter in dispute is not what right a natural person may have to have live-stock yarded at the defendants' yards, nor what may be the right of the general public in that regard, but whether the complainants have such right. This is not a suit by the attorney-general asking for the protection or vindication of a public right, nor a suit by a natural person asking to be protected against a special and peculiar injury which he must suffer if deprived of a right, which he, in common with all the citizens of the state, is entitled to enjoy ; but it is a suit by a corporation, to enforce a right which it says belongs to it as a body corporate.

The complainants are the mere creature of legislative power, and have no capacity or rights, and can exercise no powers except such as have been given to them by their creator. They exist by force of legislative authority, and have no rights except such as the legislature has given to them, or as they have acquired by contract, or as have arisen from custom or usage, so long and uniformly pursued as to have become a part of our general system of laws. Where, in a case like the present, one corporation seeks judicial redress against another, on the ground that the other has

refused to give a service or to perform a duty which it owes, the complaining corporation, to succeed, must show, affirmatively and clearly, that the service or duty which it claims, exists by force of a statute, or a contract, or a usage having the force of law. This I understand to be the principle on which the decision in the *Express Cases, 117 U. S. 1,* rests.

These cases, it will be remembered, arose out of the refusal of certain railroad corporations to give equal facilities, on like terms, to each express company asking to be permitted to do an express business on their roads.   Under the lead of Mr. Justice Miller, of the supreme court of the United States, it was held, both on interlocutory application and on final hearing, in several cases decided by the circuit court of the United States, in two or three different circuits, that a railroad corporation was under a legal duty, in the absence of either statutory regulation or contract obligation, to furnish to each express company, desiring to do business on its road, the same facilities for the doing of such business, which it either provided for itself or furnished to any other express company, and also that a court of equity might, in the rightful exercise of its general jurisdiction, compel the performance of this duty by injunction.   These decisions were put mainly on the ground that as railroads were public highways, and the express business had become a well-recognized instrument of commerce, it was necessary, in order that the public might have the full benefit of the general principle, making it the duty of a common carrier, who carries on his business on the public highways, to extend equal privileges and accommodations to all, on equal terms as to compensation, that this principle should be applied in defining the duty of a railroad company to an express company.   Decrees were accordingly made, compelling the defendant railroad company in each case to furnish to the complaining express company, the same facilities, on both passenger and freight trains, for the transaction of an express business on its road, that it provided for itself or furnished to any other express company.   Several of the cases in which this doctrine was enforced will be found collected in the notes to *2 Wood's Railway Law 587.*

Three of these cases were, after final hearing, carried to the supreme court of the United States, and there the decrees made below were reversed and the bills of complaint dismissed. That court held, that a duty, of the kind the complainants were seeking to have imposed upon the defendants, could only be created in three ways, namely, by usage, or by contract, or by statute, and that, inasmuch as the complainants could point neither to a usage, or to a contract, or to a statute which created the duty the courts below had attempted to enforce, it must be declared that no such duty existed. The court said the circuit courts had attempted to make such an arrangement for the business intercourse of the litigants as, in the opinion of the court, the litigants ought to have made for themselves, but that that was a thing which was beyond judicial power. Said Chief-Justice Waite, speaking for all the members of the court who heard the cases, except Justices Miller and Field (*p. 29*), "The regulation of matters of this kind is legislative in its character, not judicial. To what extent it must come, if it comes at all, from Congress, and to what extent it may come from the States, are questions we do not now undertake to decide, but that it must come, when it does come, from some source of legislative power, we do not doubt. The legislature may impose a duty, and, when imposed, it will, if necessary, be enforced by the courts, but, unless a duty has been created either by usage, or by contract, or by statute, the courts cannot be called on to give it effect."

Substantially the same principle had previously been enunciated in the decision of the *Atchison, Topeka & Santa Fe R. R. Co.* v. *Denver & New Orleans R. R. Co., 110 U. S. 667.* The names of three railroad corporations appear in this case, namely, the Atchison, Topeka and Santa Fe Railroad Company, and the Denver and New Orleans Railroad Company, and the Denver and Rio Grande Railroad Company. For brevity, the first will hereafter be called the Atchison company, the second the New Orleans company, and the third the Rio Grande company. The Atchison company controlled a line of railroad extending from Kansas City, Missouri, to Pueblo, Colorado, and the New Orleans company and Rio Grande company each owned a railroad

extending from Pueblo to Denver. The two latter ran nearly parallel and were operated as rival roads. The Atchison and Rio Grande companies, prior to the completion of the road of the New Orleans company, had made an agreement under which a through business was done, over the whole of their lines, from Kansas City to Denver. While this arrangement was in force, the New Orleans company connected its tracks with those of the Atchison company at Pueblo, at a point distant about three-quarters of a mile from the depot in Pueblo, which the Atchison and Rio Grande companies had established there for their joint accommodation. The New Orleans company erected, at the point where its tracks intersected those of the Atchison company, platforms and other conveniences for the transfer of passengers and freight from one road to the other, and then demanded that the Atchison company should stop its trains at the junction of the two roads and furnish it there with the same facilities, for doing a connected through business, that it furnished to its competitor, and for the same compensation that its competitor paid. The Atchison company refused to comply with this demand, and a bill in equity was then filed. On the final hearing of the cause, the circuit court of the United States made a decree placing the New Orleans company, at the junction it had made with the Atchison company, on an equal footing, as to the interchange of business, with the Rio Grande company, both as to facilities and prices, except in respect to the issue of through bills of lading, through checks for baggage, through tickets and the interchange of cars.

Three provisions of the constitution of Colorado were supposed, in their joint effect, to lay a foundation for this decree. These provisions declare, *first*, that all railroads shall be public highways, and all railroad companies shall be common carriers; *second*, that every railroad company shall have the right, with its road, to intersect, connect with or cross any other railroad, and, *third*, that all individuals, associations and corporations shall have equal rights to have persons and property transported over any railroad in this state, and no undue or unreasonable discrimination shall be made, in charges or facilities, for the trans-

portation of freight or passengers within this state. On appeal to the supreme court of the United States, it was decided unanimously that the decree made below was without warrant in law. The reasoning of the court, in part, was, that the right conferred by the constitution, of connecting the tracks of one road with those of another, did not confer a right upon either corporation to compel the other to form a business connection for the transaction of a through business, but that the right was limited to the formation of a mechanical union, to connect one physical structure with the other. The court, on this point, said : " The railroad companies are not to be connected, but their roads. A connection of roads may make a connection in business convenient and desirable, but the one does not necessarily carry with it the other." And, as to the claim that the Atchison company had violated the constitutional prohibition against undue or unreasonable discrimination, in refusing to interchange business with the New Orleans company, the court said, that, in the absence of statutory direction or contract obligation creating such duty, it did not exist, and, also, that it was not within the power of a court of equity to compel a railroad company, having power to regulate the running of its trains as to time, and to locate its own stopping places, to stop its trains and interchange business with another company, at such point as the other company might select for the formation of a junction between the two roads. To invest any court with power of this kind would require it to exercise functions not at all judicial in their character, but such as are, in some states, confided to a special and independent agency of government. The jurisdiction which a court of equity may rightfully exercise, in a case like the one now under consideration, was defined by Chief-Justice Waite, in the case last cited, as follows (p. 682) : "A court of chancery is not, any more than is a court of law, clothed with legislative power. It may [in cases where no adequate remedy at law exists] enforce, in its own appropriate way, the specific performance of an existing legal obligation arising out of contract, law, or usage, but it cannot create the obligation."

The complainants do not ground their claim to judicial aid on

either contract or usage. No contract relations existed between the parties at the time this suit was brought, and it is neither averred, nor proved that a custom or usage had existed for so long a time, prior to the institution of this suit, as to give it the force of law, by which the duty in question was imposed upon the defendants. The only foundation, therefore, which the complainants' case can have, is the law, and if it is found that that does not impose the duty claimed, then it must be declared that no such duty exists. It does not exist, so far as I can discover, by force of any general rule of law. In the opinion written, when the application for a preliminary injunction in this case was decided, it was said that the defendants stand, in respect to their legal duties, in a position very similar to that which a common carrier occupies, bound to serve all who have a right to demand their service, to the best of their ability, and on equal terms as to compensation. *Delaware, Lackawanna & Western R. R. Co.* v. *Central Stock-Yard Co., 16 Stew. Eq. 71, 74.* This opinion, as may be seen at a glance, was based on an assumption that there was a strong and close similitude between a railroad or canal company, in their character as a common carrier, and the defendants, both in respect to the powers which each might exercise, and the duties which each were bound to perform for the public. But it is now entirely clear that such is not the fact. Between the defendants and a railroad or canal company there is not the slightest analogy. There is not a single respect in which they bear the least resemblance to each other. Railroads and canals are public highways. They are uniformly made so by constitution, general statute or special provision of their charter, and the corporations authorized to construct them are, because their works, when constructed, are to be subject to public use as highways, given power to exercise the right of eminent domain, and for this reason such works are regarded as public highways, and each member of the public has, in consequence, an equal right to their use, upon the payment of such compensation as the legislature has seen fit to prescribe. But the defendants stand in no such relation to the public. No privilege or prerogative of government has been granted to them (except to lay tracks across

:streets), and they cannot, therefore, be held to be subject to the ·duties which may be implied from a grant of a franchise authorizing the construction of a public highway.

The defendants' business is of recent origin. Their duties and liabilities are wholly undefined, except as they may be deduced from the application of well-established legal principles to other corporations in analogous cases. No case was cited on the argument, and none is known to exist, in which the duties of a body ·corporate, like the defendants, have been the subject of judicial consideration. The business of the defendants has no exact counterpart or ·model in any of the established instruments of commerce, or agencies used by the public in the transaction of business. It bears a closer resemblance to the business carried on by warehousemen than to any other business known to the law. Except in the character of the property which is the subject of bailment, the business of the defendants corresponds, in many respects, with that of the warehouseman. That is the only business which can, in my judgment, be safely used, by way of analogy, for the purpose of ascertaining whether or not, according to established principles of general law, the defendants are .subject to the duty which the complainants ask the court to compel them to perform.

There can be no doubt, I think, that a warehouseman is not required, by any general rule of law, to receive goods on storage .against his will. In *Addison on Contracts p. 630*, it is said : "A man cannot be made a depositary without his consent ; he cannot have the possession of another man's property, with its accompanying duties and responsibilities, forced upon him against his will." This must be so from the very nature of such transactions, for all bailments, not made by force of statutory regulation, rest in ·contract, and no contract can exist without consent, express or implied. Warehouses, for the storage of grain, must, however, .since the decision of the Elevator cases, reported under the title ·of *Munn* v. *Illinois, 94 U. S. 113,* be regarded as so far public in their nature as to be subject to legislative control. That case, it will be remembered, arose out of this state of facts : By ·the constitution of Illinois, adopted in 1870, all elevators or

store-houses, where grain or other property should be stored for
compensation, were declared to be public warehouses, and the
legislature was directed to pass such laws as might be necessary
to give full effect to this provision. Statutes were afterwards
passed defining the service which the owners of such establish-
ments should render to the public, and also fixing the compensa-
tion which should be charged therefor. The validity of these
statutes was assailed, on the ground that they violated that pro-
vision of the federal constitution which prohibits a state from
depriving any person of property without due process of law.
When the case reached the supreme court of the United States,
the court divided on the main question. Mr. Justice Field, in
a dissenting opinion of remarkable power, declared the statutes
to be unconstitutional. His argument was this: That it was not
within the power of either a constitutional convention or of a leg-
islature, to change a business, which was in its nature private, to
a public business, by simply so declaring ; that the body politic
could lawfully exercise no greater dominion or control over the
business of the owners of these elevators, because they did busi-
ness with the public, than it could over the business of a black-
smith who shod horses for the public; and that it is only in
cases where the government, either general or local, has conferred
some right or privilege on a citizen, which he can use in connec-
tion with his property, or by means of which his property is
rendered more valuable to him, or he thereby enjoys an advan-
tage over others, that it may lawfully control him in the conduct
of his business, by prescribing what service he shall render to
the public and regulating the compensation he may demand for
such service. Mr. Justice Strong concurred in this view. But
the majority of the court took more advanced ground in favor
of the right of public control, and held that when a citizen de-
votes his property to a use in which the public has an interest,
he, in effect, grants to the public an interest in that use, and ren-
ders himself subject, in the use of the property so devoted, to
control by the body politic. The part of the opinion of the
majority of the court, which is most pertinent to the question
now under consideration, is that in which it is said (*p. 133*): "It

matters not in this case that these warehousemen had built their warehouses and established their business before the regulations complained of were adopted.' What they did was, from the beginning, subject to the power of the body politic to require them to conform to such regulations as might be established by the proper authority for the public good." From this statement of the law, it would seem to be undeniable that, until the proper public authority intervenes and establishes such regulations as it may deem necessary for the public good, the owners of property, devoted to a public use of this character, retain complete and absolute dominion over it, and may exclude any member of the public from its use that they see fit. Until the body politic puts in exercise its power to control the use of such property, its owner may use it as he pleases.

The discussion thus far has demonstrated, I think, that even if we were at liberty, in deciding a question of strict legal right against a new instrument of business, to enter the field of analogy, and, if there was found there a somewhat similar instrument to the one in question which had been held to be subject to certain duties, to charge the new instrument with the same duties, on the ground of its similarity to the other, that no such duty as that which complainants claim could, by force of any general rule of law, be held to rest upon the defendants.

The only other means by which the duty in question could have been created is by statute. The complainants say that it is imposed by the statute which created the defendants a body corporate. They do not say that it is imposed in express words. On the contrary, they admit that there are no words which, in plain terms, impose it, but their contention is that it should be implied from the powers granted and the general purpose of the statute. Thus it will be seen that the court, to sustain the complainants' claim, must be able to find evidence of an intention, not expressed in words, on the face of this statute, so clear and strong that it may, without fear of usurping legislative power, declare that such intention is part of the legislative will.

The defendants were created a corporation by a statute passed in 1873. *P. L. of 1873 p. 920.* They are given power to locate,

construct and maintain all necessary yards and other structures, with "aqueducts and railway tracks, switches and turnouts, for the reception, safe-keeping, feeding, watering, marketing, killing, packing and rendering, and for the weighing, delivery and transport of cattle and live-stock of every description, and also dead and undressed animals, that may be at or passing through the county of Hudson, and for the accommodation and transaction of a general stock-yard and market establishment for cattle and live-stock." They are also given authority to purchase land, and build wharves, docks and slips thereon, and to procure and run such vessels as shall be necessary for the transaction of their business, in transporting live-stock and dressed animals, in and about the harbor of New York and the Hudson river. By the fourth section of their charter, it is enacted that it shall and may be lawful for the defendants to make contracts with the several railroad companies in, or [having] lines running through the county of Hudson, for the transportation and delivery of live-stock of every description, at the yards of the defendants, and they are given power to lay tracks and turnouts to connect with the lines or tracks of each or all of the different railroad companies, said tracks to be used in the delivery of live-stock to and from the defendants' yards. Authority is also given to the defendants to lay their tracks across the streets of Jersey City in such manner, as to grade, as the common council may direct, but in no case to lay their tracks parallel with the line of the street.

In considering what construction should be given to this statute, it will be important to keep in mind that the legislature, in enacting it, were creating a corporation to establish and carry on a business which was in its infancy even where it had existed longest, and which, in this state, was entirely new. The business was one which, it was believed, would be likely to be of great public utility, if successful, but whether or not it could be made successful was uncertain when the statute was passed. To make the experiment, somebody had to risk his capital. In this state of affairs, it is not difficult to believe that there would be a natural disposition, on the part of the representatives of the people, to give those who were willing to em-

bark their money in the venture, an opportunity, free from any sort of restriction, to make the business a success, knowing that if it was made a success, and the public good should at any time in the future render it .necessary that the corporation should be controlled in its conduct towards the public, the legislature could exercise such control. This, probably, is the reason, or one of the reasons, why the least trace cannot be found anywhere in this statute of a purpose to impose a single duty on the defendants, even in behalf of the public. Railroad corporations, it will be observed, are nowhere mentioned in it, except in the fourth section, and the provisions of that section make it conspicuously clear, as I think, that it was not the intention of the legislature to impose any duty on the defendants in favor of railroad corporations, except such as they should voluntarily take upon themselves by contract. The very service which the complainants say the defendants are bound to render to them, as a legal duty, arising by implication from the terms of this statute, it will be observed is the only thing in respect to which the defendants are made competent, by express words, to make contracts with railroad corporations concerning, the language of the statute in that regard being, that it shall be lawful for the defendants to make contracts with the several railroad companies having lines running through Hudson county for the transportation and delivery of live-stock at the defendants' yards. It is important to notice that the legislature were dealing with the very matter now under consideration, namely, what should be the relation of the defendants to railroad corporations having a terminus in Hudson county. The legislature probably believed that the works the defendants proposed to construct would be of great advantage to the railroads, affording them a safe and convenient place for making delivery of live freight to its consignees, and for that reason they gave the defendants permission to lay tracks connecting their yards with the railroads, and also authorized them to make contracts with the railroads for the delivery of live-stock at their yards, but they went no further. They neither imposed upon the railroads the duty of making delivery of live-stock, against their will, to the defendants, nor upon the defendants the

duty of receiving live-stock, against their will, from the railroads. It was obviously the intention of the legislature to leave the matter of the delivery of live-stock by the railroads, and the reception of it by the defendants, to be controlled entirely by such contracts or arrangements as the parties might see fit to make. No duty, in that regard, is imposed by the statute, in express words, upon either, and, so long as this continues to be the case, no duty can be imposed by the courts without usurping legislative power.   A remark made by Mr. Justice Buller, in *Jones* v. *Smart, 1 T. R. 44,* and quoted with approbation by Chief-Justice Beasley, in *Palmateer* v. *Tilton, 13 Stew. Eq. 555,* is directly in point.   He said : " We are bound to take the act of parliament as they have made it ; a *casus omissus* can in no case be supplied by a court of law, for that would be to make laws."

Thus far the case has been considered as if it were the proper subject of equity jurisdiction.   That, however, is not my opinion.   On the contrary, I think, both in its substance and details, it is entirely outside of the proper jurisdiction of a court of equity.   It is without a single equitable feature or element.   The suit is not brought to protect an exclusive franchise, as was the action in the *Camden Horse R. R. Co.* v. *Camden Coach Co., 4 Stew. Eq. 525 ; S. C. on appeal, 6 Stew. Eq. 267,* but the complainants' case stands on nothing but the violation of an alleged legal right, which right is, as a matter of law, disputed and unsettled, has the support of neither precedent nor principle, and rests on nothing but analogies and implications.   A court of equity may interpose, under some circumstances, to protect a legal right, as when a violation is threatened, or is being actually committed, which will do irreparable damage, but it must be made clearly to appear that the complainant has the right he claims, for, if he is without right, the court is without jurisdiction. There can be no damage, irreparable or otherwise, where there is no violation of a right.   To justify the interference of a court of equity in such a case, the legal right set up by the complainant must be clear, for, as was said by Mr. Justice Dixon, speaking for the court of errors and appeals, in *Outcalt* v. *George W. Helme Co., 15 Stew. Eq. 665,* where the question is one of legal

right, a condition precedent to the right of the complainant to bring his adversary into a court of conscience is that the latter's conduct, which is claimed to be wrongful, shall appear to be unconscientious, and that this cannot be shown, unless it is made to appear that the defendant has violated a legal right which had been previously established against him by a judgment at law, or which, on the admitted facts of the case, appears to be free from doubt or question.] The complainants do not complain that the defendants have invaded their property, and are there wantonly committing great and serious damage, nor that the defendants are so using their own property as to cause irreparable injury to the complainants' property, but their complaint is that the defendants refuse to give them such use of their (the defendants') property and servants as they are entitled to by law, and that they suffer irreparable harm in consequence. What the complainants want is, that the court shall, for their benefit, control the defendants not only in the use of their property, but in the conduct of their business. Nothing short of a case of the most extreme necessity, where the legal right is entirely free from doubt, the injury great and ruinous, and the defendants' conduct wholly indefensible, would justify the exercise of so strong a power by any judicial tribunal.

Besides, it is quite apparent, as I think, that the court could not attempt to extend to the complainants the relief they ask in this case, without very soon being confronted by a condition of affairs which would compel it either to usurp power, or to very greatly relax its control over the defendants. By the express terms of their charter the defendants are given power to adopt regulations for the well-ordering of their business. Under this power they would probably have the right, among other things, to make a regulation, requiring that when live-stock is delivered to them some evidence shall be delivered with it, showing that it is in a healthy condition, or that they shall have the right to have it inspected by their own inspector before receiving it, and also to prescribe other regulations, fixing the hours in each day when stock may be delivered, and the places on their yards at which each particular kind must be delivered. The power of

Delaware, &c., R. R. Co. *v.* Central Stock-Yard Co.

making such regulations as may be necessary and convenient for the well-ordering of their business has been committed by the legislature to the defendants, and belongs to them alone. Their power in this respect is subject to but a single condition, and that is the regulations they make must be reasonable. In all other respects, the defendants are the judges, and their judgment is final. If the reasonableness of any regulation they may adopt should be disputed in a court of law, the question whether it was reasonable or not would, in the first instance, have to be settled by a jury. A common law judge has no authority to pass upon a question of that kind, except in reviewing the verdict of a jury. *State* v. *Overton, 4 Zab. 435; Morris & Essex R. R. Co. ads. Ayers, 5 Dutch. 393.* Up to the time this controversy arose, the defendants had adopted no regulations for the conduct of their business with railroad companies. There was no reason they should, for, up to that time, all their transactions with such corporations had been carried on under arrangements that were mutually satisfactory and advantageous. Now, however, if the court should decide that the complainants were entitled to the right they claim, the defendants would, without doubt, exercise their right to conduct their business, in their own way, by the adoption of such regulations as to them might seem proper. These regulations would undoubtedly become at once a new subject of controversy. The defendants would probably so frame them as to narrow the right accorded to the complainants to its smallest possible limit. Whose province would it be to settle the many questions which would certainly be raised respecting the reasonableness of the regulations adopted by the defendants— the chancellor or a jury? Could a court of equity, in a case where the sole ground of its jurisdiction is a right to interpose to prevent irreparable damage, draw to itself, as incident to the jurisdiction thus acquired, so many litigations, which, according to the well-established boundary between the two jurisdictions, belong exclusively to the common law courts? If the chancellor should assume jurisdiction in this case, he would, in my judgment, undertake to exercise what Judge Sharswood, in *Audenreid* v. *Philadelphia & Reading R. R. Co., 68 Pa. St. 370,* called a

dangerous and alarming power. He would, in effect, deprive the directors of the defendant corporation of their right to manage its affairs, and substitute himself as its supreme manager. This I cannot advise him to do.

Both for the want of legal right, and also because the case is not the proper subject of equity jurisdiction, the complainants' bill should, in my judgment, be dismissed, with costs.