# BUDD v. NEW YORK.

ERROR TO THE SUPERIOR COURT OF BUFFALO, STATE OF NEW YORK.

## NEW YORK ex rel. ANNAN v. WALSH.

## NEW YORK ex rel. PINTO v. WALSH.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

Nos. 719, 644, 645. Argued November 17, 18, 1891. — Decided February 29, 1892.

An act of the legislature of New York (Laws of 1888, chap. 581) provided that the maximum charge for elevating, receiving, weighing and discharging grain should not exceed five-eighths of one cent a bushel; and that, in the process of handling grain by means of floating and stationary elevators, the lake vessels or propellers, the ocean vessels or steamships, and canal boats, should only be required to pay the actual cost of trimming or shovelling to the leg of the elevator when unloading, and trimming cargo when loading; *Held,* that the act was a legitimate exercise of the police power of the State over a business affected with a public interest, and did not violate the Constitution of the United States, and was valid.

The case of *Munn v. Illinois,* 94 U. S. 113, reviewed and adhered to, and its application in cases decided in the state courts considered.

The decision in *Chicago &c. Railway Co.* v. *Minnesota,* 134 U. S. 418 explained.

Although the act of New York did not apply to places having less than 130,000 population, it did not deprive persons owning elevators in places of 130,000 population or more, of the equal protection of the laws.

THE case, as stated by the court, was as follows:

On the 9th of June, 1888, the governor of the State of New York approved an act, chapter 581 of the laws of New York of 1888, which had been passed by the two houses of the legislature, three-fifths being present, entitled "An act to regulate the fees and charges for elevating, trimming, receiving, weighing and discharging grain by means of floating and stationary elevators and warehouses in this State." The act was in these words: "Section 1. The maximum charge for elevating, receiving, weighing and discharging grain by means of floating and

stationary elevators and warehouses in this State shall not exceed the following rates, namely: For elevating, receiving, weighing and discharging grain, five-eighths of one cent a bushel. In the process of handling grain by means of floating and stationary elevators, the lake vessels or propellers, the ocean vessels or steamships, and canal boats, shall only be required to pay the actual cost of trimming or shovelling to the leg of the elevator when unloading, and trimming cargo when loading. § 2. Any person or persons violating the provisions of this act, shall, upon conviction thereof, be adjudged guilty of a misdemeanor, and be punished by a fine of not less than two hundred and fifty dollars and costs thereof. § 3. Any person injured by the violation of the provisions of this act, may sue for and recover any damages he may sustain against any person or persons violating said provisions. § 4. This act shall not apply to any village, town, or city having less than one hundred and thirty thousand population. § 5. This act shall take effect immediately."

On the 26th of November, 1888, an indictment which had been found by the grand jury of Erie County, New York, in the court of sessions of that county, against J. Talman Budd, for charging and receiving fees for elevating, receiving, weighing and discharging grain into and from a stationary elevator and warehouse, contrary to the provisions of said statute, came on for trial, before a criminal term of the Superior Court of Buffalo, Erie County.

The charge in the indictment was, that Budd, at Buffalo, on the 19th of September, 1888, being manager of the Wells elevator, which was an elevator and warehouse for receiving and discharging grain in the city of Buffalo, that city being a municipal corporation duly organized in pursuance of the laws of the State of New York and having a population of upwards of 130,000 people, did receive, elevate and weigh from the propeller called the Oceanica, the property of the Lehigh Valley Transportation Company, a body corporate, 51,000 bushels of grain and corn, the property of said company, into the said Wells elevator, and unlawfully exacted from said company, for elevating, receiving, weighing and

discharging said grain and corn, the sum of one cent a bushel, and also exacted from said company, for shovelling to the leg of the elevator, in the unloading of said 51,000 bushels of grain and corn, $1.75 for every 1000 bushels thereof, over and above the actual cost of such shovelling.

The facts set forth in the indictment were proved, and the defendant's counsel requested the court to instruct the jury to render a verdict of acquittal, on the ground that the prosecution was founded on a statute which was in conflict both with the Constitution of the United States and with that of the State of New York; that the services rendered by Budd, for which the statute assumed to fix a price, were not public in their nature; that neither the persons rendering them, nor the elevator in question, had received any privilege from the legislature; and that such elevator was not a public warehouse and received no license. The court declined to direct a verdict of acquittal, and the defendant excepted.

The court charged the jury that it was claimed by the prosecution that the defendant had violated the statute in charging more than five-eights of one cent a bushel for elevating, receiving, weighing and discharging the grain, and in charging more than the actual cost of trimming or shovelling to the leg of the elevator, in unloading the propeller; that the statute was constitutional; and that the jury should find the defendant guilty as charged in the indictment, if they believed the facts which had been adduced. The defendant excepted to that part of the charge which instructed the jury that they might find the defendant guilty of exacting an excessive rate for shovelling to the leg of the elevator, and also to that part which instructed the jury that they might convict the defendant for having exacted an excessive rate for elevating, receiving, weighing and discharging the grain and corn.

The jury brought in a verdict of guilty as charged in the indictment, and the court sentenced the defendant to pay a fine of $250, and, in default thereof, to stand committed to the common jail of Erie County for a period not exceeding one day for each dollar of said fine. The defendant appealed

from that judgment to the general term of the Superior Court of Buffalo, which affirmed the judgment. He then appealed to the Court of Appeals of New York, which affirmed the judgment of the Superior Court of Buffalo; and the latter court afterwards entered a judgment making the judgment of the Court of Appeals its judgment. The defendant then sued out from this court a writ of error directed to the Superior Court of Buffalo.

The opinion of the Court of Appeals is reported in 117 N. Y. 1. It was delivered by Judge Andrews, with whom Chief Judge Ruger and Judges Earl, Danforth and Finch concurred. Judges Peckham and Gray dissented, Judge Gray giving a dissenting opinion, and Judge Peckham adhering to the dissenting opinion which he gave in the case of *People* v. *Walsh*, 117 N. Y. 34.

On the 22d of June, 1888, a complaint on oath was made before Andrew Walsh, a police justice of the city of Brooklyn, New York, that on the preceding day one Edward Annan, a resident of that city, had violated the provisions of chapter 581 of the laws of New York of 1888, by exacting from the complainant more than five-eighths of one cent per bushel for elevating, weighing, receiving and discharging a boatload of grain from a canal-boat to an ocean steamer, and by exacting from the canal-boat and its owner more than the actual cost of trimming or shovelling to the leg of the elevator, and by charging against the ocean steamer more than the actual cost of trimming the cargo, the services being rendered by a floating elevator of which Annan was part owner and one of the agents. On this complaint, Annan was arrested and brought before the police justice, who took testimony in the case and committed Annan to the custody of the sheriff of the county of Kings, to answer the charge before a court of special sessions in the city of Brooklyn. Thereupon writs of *habeas corpus* and *certiorari* were granted by the Supreme Court of the State of New York, on the application of Annan, returnable before the general term of that court in the first instance; but on a hearing thereon, the writs were dismissed and Annan was remanded to the custody of the sheriff. The opinion of

the general term is reported in 50 Hun, 413. Annan appealed to the Court of Appeals, which affirmed the order of the general term, 117 N. Y. 621, for the reasons set forth in the opinion in the case of Budd, 117 N. Y. 1, and the judgment of the Court of Appeals was afterwards made the judgment of the Supreme Court. Annan sued out a writ of error from this court, directed to the Supreme Court of the State of New York.

Like proceedings to the foregoing were had in the case of one Francis E. Pinto, the charge against him being that he had exacted from the complainant more than five-eighths of one cent per bushel for receiving and weighing a cargo of grain from a boat into the Pinto stores, of which he was lessee and manager, the same being a stationary grain elevator on land in the city of Brooklyn, New York, and had exacted more than the actual cost of trimming or shovelling to the leg of the elevator. Pinto sued out from this court a writ of error to the Supreme Court of the State of New York.

*Mr. Benjamin F. Tracy* and *Mr. William N. Dykman* for Annan and Pinto, plaintiffs in error.

I. Floating elevators in the port of New York are private. They are not affected with any public interest, and they are not subject to regulation of rates. They are comparable to threshing machines which are moved about the country from one farm to another by horse power. In both machines there is the element of property, but in each case labor predominates.

We are helped in our study of Mr. Annan's status by decisions of the New York Court of Appeals fixing the status of his fellow-laborers in the grain trade.

In *Fish* v. *Clark*, 49 N. Y. 122 a canal-boat owner was held not to be a common carrier. The case arose over a cargo lost by the sinking of the boat, and plaintiffs asserted that the defendant canal-boat owner was liable absolutely and without proof of negligence, because, they said, he was a common carrier. The whole case turned on whether he was a public or a private carrier.

It is also settled in New York that the steamboat which

tows the canal-boat is not a common carrier. *Alexander* v. *Greene*, 3 Hill, 9; *Caton* v. *Rumney*, 13 Wend. 387; *Wells* v. *Steam Nav. Co.*, 2 N. Y. 204.

The stationary elevators along the Brooklyn shore are wholly private. *Wetmore* v. *Brooklyn Gas Light Co.*, 42 N. Y. 384; *Woodruff* v. *Havemeyer*, 106 N. Y. 129. Those were the cases of the wharves in front of the elevators, but the principle was distinctly enunciated that the riparian owners could exclude the public.

It is not conceivable that all who handle merchandise brought to New York by rail shall be held to be *quasi* public, and subject to have prices limited for their services, because the merchandise has been carried over a way built by permission and under a charter granted by the State. The fact that the one is a way on land, maintained by a grantee or appointee of the sovereign, and the other a waterway, maintained by the sovereign, does not alter the principle under discussion. But even if the law were or can be limited to grain carried through the canal, it is certain that the canal does not impress with a public character those who are engaged in carrying merchandise through it. *Fish* v. *Clark*, 49 N. Y. 122; *Wells* v. *Steam Nav. Co.*, 2 N. Y. 204; *Alexander* v. *Greene*, 3 Hill, 9.

II. This law cannot be defended upon the ground that the legislature may determine in an act what rates are equal and reasonable.

Upon the face of this act appears its true nature, intent and aim. Experience had shown that grain was most easily and economically moved and handled where the bill of lading under which the canal carrier transports his cargo bound him to deliver his cargo out of his boat and to pay therefor, and where the owner delivered the cargo to the ocean carrier, who, in his turn, bore the expense of stowing the grain against the voyage. But the canal-boatmen, conceiving this to be unjust, secured in this act a provision that they shall only pay for shovelling the grain to the leg of the elevator, and for that only at the actual cost of labor; and it is enacted also that the ocean carrier shall only be required to pay the actual cost of the labor involved in stowing his cargo.

It results that the elevator owner must hire men, superintend their labor and be responsible for its results, and *all without compensation,* for he can charge only what he pays out for labor. The law, therefore, cannot be defended as a determination what rates are equal and reasonable. It is a law prescribing the terms of the several contracts involved in moving grain. It enacts who shall pay. It provides how much each shall contribute. It compels the grain owner to pay for all the work done for him and for a part of the work done for the canal and ocean carrier.

III. This law is unconstitutional even if it be conceded or determined that the "Ceres" is a common or public elevator, for that would at the very furthest do no more than lower the rights of an elevator owner to those of a railroad company or other common carrier. *Chicago, Milwaukee & St. Paul Railway* v. *Minnesota,* 134 U. S. 418. Since that decision we understand it to be the settled doctrine of this court, that a law exercising the function of the State to control the prices charged by railroad common carriers and others subject to the like regulation, in order that their charges may be reasonable, must provide judicial forms and judicial machinery for the determination of the question or at least must leave the question open for an examination in the courts, and that an attempt to regulate rates without providing judicial machinery and depriving the constituted courts of jurisdiction is unconstitutional and void.

It follows that unless the law of New York permits a judicial investigation into the reasonableness of the rates fixed it also is in violation of the Constitution of the United States.

Whether a statute is constitutional or not is always a question of power — that is, a question whether the legislature in the particular case, in respect to the subject matter of the act, the manner in which its object is to be accomplished and the mode of enacting it has kept within the constitutional limits and observed the constitutional conditions. In any case in which this question is answered in the affirmative the courts are not at liberty to inquire into the proper exercise of the power. They must assume that legislative discretion has been

properly exercised.   If evidence was required it must be supposed that it was before the legislature when the act was passed, and if any special finding was required to warrant the passage of the particular act it would seem that the passage of the act itself might be held equivalent to such finding. Cooley's Const. Lim. 222.

The "subject matter" raises the question whether floating elevators are within the legislative jurisdiction.  "The manner in which its object is to be accomplished" means that a "subject matter" may be concededly within the legislative jurisdiction, and the law be void for a defect in methods of accomplishment.  This court, in *The Chicago, Milwaukee & St. Paul Case*, held the Minnesota law unconstitutional and void for just such a defect, viz. : an attempt to exclude the courts from jurisdiction over the question of reasonableness of rates, and this defect of method is, we contend, equally fatal to the New York law.

IV.  As to the judgment of this court in *Munn* v. *Illinois*, 94 U. S. 113, we submit, with very great respect that the mediæval rules and instances were allowed too great influence in that judgment.  When England was mainly a pastoral and agricultural country, with her trade and commerce in their infancy, all sorts of burdensome restrictions were imposed upon the individual by a paternal theory of government for the supposed benefit of trade.  But even at these times and in the midst of this mediæval darkness, the course of the judges was towards freedom.  In the latter part of the eighteenth century there was a general awakening to the false theories which had permitted these impositions.  In England Adam Smith's great work was followed by many repeals of vicious regulations, and by an entire cessation of new restraints.  In France the edict of Louis XVI liberated trade from corresponding restrictions.  In America the Declaration of Independence set forth the inalienable right of all men to life, liberty and the pursuit of happiness; that is, among other things to the right to enjoy and acquire property. That the essence of the right of property is in its use and in the power of alienation for use by others is obvious.  Without

these the right is illusionary and valueless. Chief Justice Marshall long since taught us that to tax the sale of property is to tax the property itself. *Brown* v. *Maryland*, 12 Wheat. 419. The same proposition was repeated in *Welton* v. *Missouri*, 91 U. S. 275, Mr. Justice Field delivering the opinion of the unanimous court. See also *Wynehamer* v. *People*, 13 N. Y. 378; *In the matter of Jacobs*, 98 N. Y. 98, 106.

Our whole commercial history shows that our Constitution fixes a great and wide gulf between the old and the new; between mediæval darkness, which permitted every detail of one's life to be regulated, and modern freedom of action. We do not think that the judgment in the *Munn Case* estimated truly the condemnation of the old system, its separation from the new, and the consequent weakness of argument drawn from mediæval times.

Mr. Chief Justice Waite made the basis of his judgment the custom "in England from time immemorial and in this country from its first colonization to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished and articles sold."

We very respectfully deny the custom or the right to regulate the price of bread. Cooley's Constitutional Limitations, 736, *n. 3*; *Mobile* v. *Yuille*, 3 Alabama, 137; *S. C.* 36 Am. Dec. 441.

Mills were regulated at first, and the toll which the miller might take was prescribed, because to grind grain was a franchise and might not be done without permission from the king or the lord of the manor. 15 Viner's Abridgment, 398; Cooley's Constitutional Limitations (5th ed.) 736; *Hix* v. *Gardiner*, 2 Bulstr. 195.

Hackmen have a *legal monopoly*. It is a trade which the law can prohibit and suppress, but which it licenses and controls instead. The right to ply vehicles for hire from exclusive stands in the streets is not a natural right, but wholly acquired from the State, which of course has the right to prescribe terms to the privilege it creates. Cooley's Constitutional Limitations (5th ed.) 736.

To have a ferry is a franchise, and the governmental control is based on the fact that the right to use a boat for ferriage must come by state grant, which prescribes the conditions of the use. Sir Matthew Hale, *De Portibus Maris*, quoted by Chief Justice Waite, p. 126; *Mayor* v. *Starin*, 106 N. Y. 1; *Mills* v. *St. Clair County Commissioner*, 4 Illinois (3 Scammon), 53; *Trustees &c.* v. *Tatman*, 13 Illinois, 27.

That private wharves are the rule and public wharves the exception, may be proved from C. J. Waite's quotation from Sir Matthew Hale's text, *De Portibus Maris*. *Munn* v. *Illinois*, 94 U. S. 127. In New York, the Brooklyn wharves are private. *Wetmore* v. *Brooklyn Gas Co.*, 42 N. Y. 384; *Woodruff* v. *Havemeyer*, 106 N. Y. 129. And it is doubtful if warehouses are public in that State. *In re Eureka Warehouse Co.*, 96 N. Y. 42.

In mediæval times common carriers and common farriers were alike bound to practise their art on demand, and show skill in it. *Jackson* v. *Rogers*, 2 Shower, 332. The distinction between public and private carriers was known of old. *Hutton* v. *Osborne*, cited in Selwyn's Nisi Prius, 401. This distinction is still preserved in the law. *Allen* v. *Sackrider*, 37 N. Y. 341; *Fish* v. *Clark*, 49 N. Y. 122.

There was always, then, in every case where a wharf, or a warehouse, or an inn, or a carrier was alleged to be public or common, a question of fact to be determined, viz.: Had the individual done the acts or had his property the antecedents and concomitants which give the public rights to his services and the use of his property? We affirm that this right to have it established in court by evidence that the individual is in the public service is a property right and is guaranteed by the Constitution of the United States.

The opinion of the Chief Justice in *Munn* v. *Illinois*, disposes of this element in the authorities by adjudging that it is a question for the legislature, and presuming in favor of the law that the legislature has decided that all who are within the terms of the law were at its date in a common or public employment, and fit subjects for regulation of prices.

The law of New York here in question attempts to regulate

all elevators in cities of over 130,000 population, viz.: New York, Brooklyn and Buffalo. It in effect declares that all elevators in these cities are and shall be public elevators. We contend that no state of circumstances can exist to justify this statute, and, within the doctrine of all the cases, we ask that it be declared void. It is impossible to justify this law by the precedents relied upon in the *Munn Case.* The elements of publicity are in almost every case wholly within individual control.

There has not been and there cannot be in New York any such situation as existed in Chicago. No man and no set of men in New York can fix a rate of toll and thus tax commerce. There will always be in the port of New York a genuine competition. Our floating elevator is radically different from Munn's warehouse in itself and in its surroundings.

V. This law is unconstitutional and void because it decides that Annan's elevator is not private, and therefore free from legislative control without due process of law. It governs and regulates all elevators in cities having 130,000 population, and the Supreme Court, construing the law, held that no evidence before the magistrate could be considered. The Court of Appeals of New York in its opinion, (117 N. Y. 621,) said: "We are of opinion that the statute of 1888 is constitutional as a whole, and although it may comprehend cases which, standing alone, might not justify legislative interference, yet they must be governed by the general rule enacted by the legislature."

We take issue at this point: Ours is, we contend, a case comprehended by the statute, yet not justifying legislative interference, and we submit as the true rule that if one single case falls within the statute whose antecedents and concomitants do not justify legislative coercion, the law is void. *The People* v. *Marx,* 99 N. Y. 377; *Morgan* v. *King,* 35 N. Y. 454; *S. C.* 91 Am. Dec. 58; *In the Matter of Jacobs,* 98 N. Y. 98; *Ervine's Appeal,* 16 Penn. St. 266; *S. C.* 55 Am. Dec. 499; *Hurtado* v. *California,* 110 U. S. 516.

VI. This law violates the Constitution of the United States in that it refuses to and takes from elevator owners the equal protection of the laws.

By this act owners of elevators in cities of less than 130,000 inhabitants are left free to make their own bargains, while in cities of over 130,000 population they are constrained to take the statutory rate.

Yonkers is a city of less than 130,000 inhabitants and so is Long Island City. The former adjoins New York City and the latter is separated from it only by the East River, and only a narrow creek — perhaps two hundred feet wide — separates Brooklyn and Long Island City. In Yonkers or Long Island City or in Albany or Rochester an elevator owner is free, while in Brooklyn, Buffalo and New York they are deprived of their freedom. Such a law deprives elevator owners in the larger cities of the equal protection of the laws. *The Railroad Tax Cases*, 13 Fed. Rep. 722; *Santa Clara County* v. *Southern Pacific Railroad*, 118 U. S. 394; *Barbier* v. *Connolly*, 113 U. S. 27; *Hayes* v. *Missouri*, 120 U. S. 68.

*Mr. Spencer Clinton* for Budd, plaintiff in error.

*Mr. J. A. Hyland* for the defendants in error in 644 and 645.

*Mr. George T. Quinby* filed a brief for the defendants in error in 719.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

The main question involved in these cases is whether this court will adhere to its decision in *Munn* v. *Illinois*, 94 U. S. 113.

The Court of Appeals of New York, in *People* v. *Budd*, 117 N. Y. 1, held that chapter 581 of the laws of 1888 did not violate the constitutional guarantee protecting private property, but was a legitimate exercise of the police power of the State over a business affected with a public interest. In regard to the indictment against Budd, it held that the charge of exacting more than the statute rate for elevating was proved; and that as to the alleged overcharge for shovelling, it

appeared that the carrier was compelled to pay $4 for each 1000 bushels of grain, which was the charge of the shovellers' union, by which the work was performed, and that the union paid the elevator, for the use of the latter's steam shovel, $1.75 for each 1000 bushels. The court held that there was no error in submitting to the jury the question as to the overcharge for shovelling; that the intention of the statute was to confine the charge to the "actual cost" of the outside labor required; and that a violation of the act in that particular was proved; but that, as the verdict and sentence were justified by proof of the overcharge for elevating, even if the alleged overcharge for shovelling was not made out, the ruling of the Superior Court of Buffalo could not have prejudiced Budd. Of course, this court, in these cases, can consider only the Federal questions involved.

It is claimed, on behalf of Budd, that the statute of the State of New York is unconstitutional, because contrary to the provisions of section 1 of the Fourteenth Amendment to the Constitution of the United States, in depriving the citizen of his property without due process of law; that it is unconstitutional in fixing the maximum charge for elevating, receiving, weighing and discharging grain by means of floating and stationary elevators and warehouses at five-eighths of one cent a bushel and in forbidding the citizen to make any profit upon the use of his property or labor; and that the police power of the State extends only to property or business which is devoted by its owner to the public, by a grant to the public of the right to demand its use. It is claimed on behalf of Annan and Pinto that floating and stationary elevators in the port of New York are private property, not affected with any public interest, and not subject to the regulation of rates.

"Trimming" in the canal-boat, spoken of in the statute, is shovelling the grain from one place to another, and is done by longshoremen with scoops or shovels; and "trimming" the ship's cargo when loading is stowing it and securing it for the voyage. Floating elevators are primarily boats. Some are scows, and have to be towed from place to place by steam tugs; but the majority are propellers. When the floating elevator

arrives at the ship and makes fast alongside of her, the canal-boat carrying the grain is made fast on the other side of the elevator. A long wooden tube, called "the leg of the elevator," and spoken of in the statute, is lowered from the tower of the elevator so that its lower end enters the hold of the canal-boat in the midst of the grain. The "spout" of the elevator is lowered into the ship's hold. The machinery of the elevator is then set in motion, the grain is elevated out of the canal-boat, received and weighed in the elevator, and discharged into the ship. The grain is lifted in "buckets" fastened to an endless belt which moves up and down in the leg of the elevator. The lower end of the leg is buried in the grain so that the buckets are submerged in it. As the belt moves, each bucket goes up full of grain, and at the upper end of the leg, in the elevator tower, empties its contents into the hopper which receives the grain. The operation would cease unless the grain was trimmed or shovelled to the leg as fast as it is carried up by the buckets. There is a gang of longshoremen who shovel the grain from all parts of the hold of the canal-boat to "the leg of the elevator," so that the buckets may be always covered with grain at the lower end of the leg. This "trimming or shovelling to the leg of the elevator," when the canal-boat is unloading, is that part of the work which the elevator owner is required to do at the "actual cost."

In the Budd and Pinto cases, the elevator was a stationary one on land; and in the Annan case, it was a floating elevator. In the Budd case, the Court of Appeals held that the words "actual cost," used in the statute, were intended to exclude any charge by the elevator beyond the sum specified, for the use of its machinery in shovelling, and the ordinary expenses of operating it, and to confine the charge to the actual cost of the outside labor required for trimming and bringing the grain to the leg of the elevator; and that the purpose of the statute could be easily evaded and defeated if the elevator owner were permitted to separate the services, and charge for the use of the steam shovel any sum which might be agreed upon between him and the shovellers' union, and thereby, under color of charging for the use of his steam shovel, exact from the

carrier a sum for elevating beyond the rate fixed therefor by the statute.

The Court of Appeals, in its opinion in the Budd case, considered fully the question as to whether the legislature had power, under the constitution of the State of New York, to prescribe a maximum charge for elevating grain by stationary elevators, owned by individuals or corporations who had appropriated their property to that use and were engaged in that business; and it answered the inquiry in the affirmative. It also reviewed the case of *Munn* v. *Illinois*, 94 U. S. 113, and arrived at the conclusion that this court there held that the legislation in question in that case was a lawful exercise of legislative power, and did not infringe that clause of the Fourteenth Amendment to the Constitution of the United States which provides that no State shall "deprive any person of life, liberty or property without due process of law;" and that the legislation in question in that case was similar to, and not distinguishable in principle from, the act of the State of New York.

In regard to *Munn* v. *Illinois*, the Court of Appeals said that the question in that case was raised by an individual owning an elevator and warehouse in Chicago, erected for, and in connection with which he had carried on, the business of elevating and storing grain, many years prior to the passage of the act in question, and prior also to the adoption of the amendment to the constitution of Illinois in 1870, declaring all elevators and warehouses, where grain or other property is stored for a compensation, to be public warehouses. The Court of Appeals then cited the cases of *People ex rel. etc.* v. *B. & A. R. R. Co.*, 70 N. Y. 569; *Bertholf* v. *O'Reilly*, 74 N. Y. 509; *B. E. S. R. R. Co.* v. *B. S. R. R. Co.*, 111 N. Y. 132; and *People* v. *King*, 110 N. Y. 418, as cases in which *Munn* v. *Illinois* had been referred to by it, and said that it could not overrule and disregard *Munn* v. *Illinois* without subverting the principle of its own decision in *People* v. *King*, and certainly not without disregarding many of its deliberate expressions in approval of the principle of *Munn* v. *Illinois:*

The Court of Appeals further examined the question whether

the power of the legislature to regulate the charge for elevating grain, where the business was carried on by individuals upon their own premises, fell within the scope of the police power, and whether the statute in question was necessary for the public welfare. It affirmed that, while no general power resided in the legislature to regulate private business, prescribe the conditions under which it should be conducted, fix the price of commodities or services or interfere with freedom of contract, and while the merchant, manufacturer, artisan and laborer, under our system of government, are left to pursue and provide for their own interests in their own way, untrammelled by burdensome and restrictive regulations, which, however common in rude and irregular times, are inconsistent with constitutional liberty, yet there might be special conditions and circumstances which brought the business of elevating grain within principles which, by the common law and the practice of free governments, justified legislative control and regulation in the particular case, so that the statute would be constitutional; that the control which, by common law and by statute, was exercised over common carriers, was conclusive upon the point that the right of the legislature to regulate the charges for services in connection with the use of property did not depend in every case upon the question whether there was a legal monopoly, or whether special governmental privileges or protection had been bestowed; that there were elements of publicity in the business of elevating grain which peculiarly affected it with a public interest; that those elements were found in the nature and extent of the business, its relation to the commerce of the State and country, and the practical monopoly enjoyed by those engaged in it; that about 120,000,000 bushels of grain come annually to Buffalo from the West; that the business of elevating grain at Buffalo is connected mainly with lake and canal transportation; that the grain received at New York in 1887 by way of the Erie Canal and Hudson River, during the season of canal navigation, exceeded 46,000,000 bushels, an amount very largely in excess of the grain received during the same period by rail and by river and coastwise vessels; that the elevation of that grain from lake vessels to canal-boats

takes place at Buffalo, where there are thirty or forty elevators, stationary and floating; that a large proportion of the surplus cereals of the country passes through the elevators at Buffalo and finds its way through the Erie Canal and Hudson River to the seaboard at New York, whence it is distributed to the markets of the world.; that the business of elevating grain is an incident to the business of transportation, the elevators being indispensable instrumentalities in the business of the common carrier, and in a broad sense performing the work of carriers, being located upon or adjacent to the waters of the State, and transferring the cargoes of grain from the lake vessels to the canal-boats, or from the canal-boats to the ocean vessels, and thereby performing an essential service in transportation; that by their means the transportation of grain by water from the upper lakes to the seaboard is rendered possible; that the business of elevating grain thus has a vital relation to commerce in one of its most important aspects; that every excessive charge made in the course of the transportation of grain is a tax upon commerce; that the public has a deep interest that no exorbitant charges shall be exacted at any point, upon the business of transportation; and that whatever impaired the usefulness of the Erie Canal as a highway of commerce involved the public interest.

The Court of Appeals said that, in view of the foregoing exceptional circumstances, the business of elevating grain was affected with a public interest, within the language of Lord Chief Justice Hale, in his treatise *De Portibus Maris*, (Harg. Law Tracts, 78;) that the case fell within the principle which permitted the legislature to regulate the business of common carriers, ferrymen and hackmen, and interest on the use of money; that the underlying principle was, that business of certain kinds holds such a peculiar relation to the public interest that there is superinduced upon it the right of public regulation; and that the court rested the power of the legislature to control and regulate elevator charges upon the nature and extent of the business, the existence of a virtual monopoly, the benefit derived from the Erie Canal's creating the business and making it possible, the interest to trade and commerce,

the relation of the business to the property and welfare of the
State, and the practice of legislation in analogous cases, col-
lectively creating an exceptional case and justifying legislative
regulation.

The opinion further said that the criticism to which the
case of *Munn* v. *Illinois* had been subjected proceeded mainly
upon a limited and strict construction and definition of the
police power; that there was little reason, under our system
of government, for placing a close and narrow interpretation
on the police power, or restricting its scope so as to hamper
the legislative power in dealing with the varying necessities
of society and the new circumstances as they arise calling for
legislative intervention in the public interest; and that no
serious invasion of constitutional guarantees by the legislature
could withstand for a long time the searching influence of
public opinion, which was sure to come sooner or later to the
side of law, order and justice, however it might have been
swayed for a time by passion or prejudice, or whatever aberra-
tions might have marked its course.

We regard these views which we have referred to as an-
nounced by the Court of Appeals of New York, so far as they
support the validity of the statute in question, as sound and
just.

In *Munn* v. *Illinois*, the constitution of Illinois, adopted in
1870, provided in article 13, section 1, as follows: "All eleva-
tors or storehouses, where grain or other property is stored for
a compensation, whether the property stored be kept sepa-
rated or not, are declared to be public warehouses;" and the
act of the legislature of Illinois approved April 25, 1871,
(Public Laws of Illinois, of 1871–72, p. 762,) divided public
warehouses into three classes, prescribed the taking of a li-
cense and the giving of a bond, and fixed a maximum charge,
for warehouses belonging to class A, for storing and handling
grain, including the cost of receiving and delivering, and im-
posed a fine on conviction for not taking the license or not
giving the bond. Munn and Scott were indicted, convicted
and fined for not taking out the license and not giving the
bond, and for charging rates for storing and handling grain

higher than those established by the act. Section 6 of the act provided that it should be the duty of every warehouseman of class A to receive for storage any grain that might be tendered to him. Munn and Scott were the managers and lessees. of a public warehouse, such as was named in the statute. The Supreme Court of Illinois having affirmed the judgment of conviction against them, on the ground that the statute of Illinois was a valid and constitutional enactment, *Munn v. People,* 69 Illinois, 80, they sued out a writ of error from this court, and contended that the provisions of the sections of the statute of Illinois which they were charged with having violated were repugnant to the third clause of § 8 of article 1, and the sixth clause of § 9 of article 1, of the Constitution of the United States, and to the Fifth and Fourteenth Amendments of that Constitution.

This court, in *Munn v. Illinois,* the opinion being delivered by Chief Justice Waite, and there being a published dissent by only two justices, considered carefully the question of the repugnancy of the Illinois statute to the Fourteenth Amendment. It said, that under the powers of government inherent in every sovereignty, " the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good ;" and that, " in their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, inn-keepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold." It was added : " To this day, statutes are to be found in many of the States upon some or all these subjects ; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property." It announced as its conclusions that, down to the time of the adoption of the Fourteenth Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due

process of law; that, when private property was devoted to a public use, it was subject to public regulation; that Munn and Scott, in conducting the business of their warehouse, pursued a public employment and exercised a sort of public office, in the same sense as did a common carrier, miller, ferryman, inn-keeper, wharfinger, baker, cartman or hackney coachman; that they stood in the very gateway of commerce and took toll from all who passed; that their business tended "to a common charge," and had become a thing of public interest and use; that the toll on the grain was a common charge; and that, according to Lord Chief Justice Hale, every such warehouseman "ought to be under a public regulation, viz.:" that he "take but reasonable toll."

This court further held in *Munn* v. *Illinois*, that the business in question was one in which the whole public had a direct and positive interest; that the statute of Illinois simply extended the law so as to meet a new development of commercial progress; that there was no attempt to compel the owners of the warehouses to grant the public an interest in their property, but to declare their obligations if they used it in that particular manner; that it mattered not that Munn and Scott had built their warehouses and established their business before the regulations complained of were adopted; that, the property being clothed with a public interest, what was a reasonable compensation for its use was not a judicial, but a legislative question; that, in countries where the common law prevailed, it had been customary from time immemorial for the legislature to declare what should be a reasonable compensation under such circumstances, or to fix a maximum beyond which any charge made would be unreasonable; that the warehouses of Munn and Scott were situated in Illinois and their business was carried on exclusively in that State; that the warehouses were no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another; that their regulation was a thing of domestic concern; that, until Congress acted in reference to their interstate relations, the State might exercise all the powers of government over them, even though

in so doing it might operate indirectly upon commerce outside its immediate jurisdiction; and that the provision of § 9 of article 1 of the Constitution of the United States operated only as a limitation of the powers of Congress, and did not affect the States in the regulation of their domestic affairs. The final conclusion of the court was, that the act of Illinois was not repugnant to the Constitution of the United States; and the judgment was affirmed.

In *Sinking Fund Cases*, 99 U. S. 700, 747, Mr. Justice Bradley, who was one of the justices who concurred in the opinion of the court in *Munn* v. *Illinois*, speaking of that case, said: " The inquiry there was as to the extent of the police power in cases where the public interest is affected; and we held that when an employment or business becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community, it is subject to regulation by the legislative power." Although this was said in a dissenting opinion in *Sinking Fund Cases*, it shows what Mr. Justice Bradley regarded as the principle of the decision in *Munn* v. *Illinois*.

In *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347, 354, this court said: " That it is within the power of the government to regulate the prices at which water shall be sold by one who enjoys a virtual monopoly of the sale, we do not doubt. That question is settled by what was decided on full consideration in *Munn* v. *Illinois*, 94 U. S. 113. As was said in that case, such regulations do not deprive a person of his property without due process of law."

In *Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557, 569, Mr. Justice Miller, who had concurred in the judgment in *Munn* v. *Illinois*, referred, in delivering the opinion of the court, to that case, and said: " That case presented the question of a private citizen, or unincorporated partnership, engaged in the warehousing business in Chicago, free from any claim of right or contract under an act of incorporation of any State whatever, and free from the question of continuous

transportation through several States. And in that case the court was presented with the question, which it decided, whether any one engaged in a public business, in which all the public had a right to require his service, could be regulated by acts of the legislature in the exercise of this public function and public duty, so far as to limit the amount of charges that should be made for such services."

In *Dow* v. *Beidelman*, 125 U. S. 680, 686, it was said by Mr. Justice Gray, in delivering the opinion of the court, that in *Munn* v. *Illinois* the court, after affirming the doctrine that by the common law carriers or other persons exercising a public employment could not charge more than a reasonable compensation for their services, and that it is within the power of the legislature " to declare what shall be a reasonable compensation for such services, or, perhaps more properly speaking, to fix a maximum beyond which any charge made would be unreasonable," said that to limit the rate of charges for services rendered in the public employment, or for the use of property in which the public has an interest, was only changing a regulation which existed before, and established no new principle in the law, but only gave a new effect to an old one.

In *Chicago &c. Railroad Co.* v. *Minnesota*, 134 U. S. 418, 461, it was said by Mr. Justice Bradley, in his dissenting opinion, in which Mr. Justice Gray and Mr. Justice Lamar concurred, that the decision of the court in that case practically overruled *Munn* v. *Illinois;* but the opinion of the court did not say so, nor did it refer to *Munn* v. *Illinois;* and we are of opinion that the decision in the case in 134 U. S. is, as will be hereafter shown, quite distinguishable from the present cases.

It is thus apparent that this court has adhered to the decision in *Munn* v. *Illinois* and to the doctrines announced in the opinion of the court in that case; and those doctrines have since been repeatedly enforced in the decisions of the courts of the States.

In *Railway* v. *Railway*, 30 Ohio St. 604, 616, in 1877, it was said, citing *Munn* v. *Illinois:* " When the owner of property devotes it to a public use, he, in effect, grants to the public

an interest in such use, and must, to the extent of the use, submit to be controlled by the public, for the common good, as long as he maintains the use." That was a decision by the Supreme Court Commission of Ohio.

In *State* v. *Gas Company*, 34 Ohio St. 572, 582, in 1878, *Munn* v. *Illinois* was cited with approval, as holding that where the owner of property devotes it to a use in which the public have an interest, he in effect grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public, for the common good, so long as he maintains the use; and the court added that in. *Munn* v. *Illinois* the principle was applied to warehousemen engaged in receiving and storing grain; that it was held that their rates of charges were subject to legislative regulation; and that the principle applied with greater force to corporations when they were invested with franchises to be exercised to subserve the public interest.

The Supreme Court of Illinois, in *Ruggles* v. *People*, 91 Illinois, 256, 262, in 1878, cited *Munn* v. *People*, 69 Illinois, 80, which was affirmed in *Munn* v. *Illinois*, as holding that it was competent for the general assembly to fix the maximum charges by individuals keeping public warehouses for storing, handling and shipping grain, and that, too, when such persons had derived no special privileges from the State, but were, as citizens of the State, exercising the business of storing and handling grain for individuals.

The Supreme Court of Alabama, in *Davis* v. *The State*, 68 Alabama, 58, in 1880, held that a statute declaring it unlawful, within certain counties, to transport or move, after sunset and before sunrise of the succeeding day, any cotton in the seed, but permitting the owner or purchaser to remove it from the field to a place of storage, was not unconstitutional. Against the argument that the statute was such a despotic interference with the rights of private property as to be tantamount, in its practical effect, to a deprivation of ownership "without due process of law," the court said that the statute sought only to regulate and control the transportation of cotton in one particular condition of it, and was a mere police

regulation, to which there was no constitutional objection, citing *Munn* v. *Illinois.* It added, that the object of the statute was to regulate traffic in the staple agricultural product of the State, so as to prevent a prevalent evil, which, in the opinion of the law-making power, might do much to demoralize agricultural labor and to destroy the legitimate profits of agricultural pursuits, to the public detriment, at least within the specified territory.

In *Baker* v. *The State,* 54 Wisconsin, 368, 373, in 1882, *Munn* v. *Illinois* was cited with approval by the Supreme Court of Wisconsin, as holding that the legislature of Illinois had power to regulate public warehouses, and the warehousing and inspection of grain within that State, and to enforce its regulations by penalties, and that such legislation was not in conflict with any provision of the Federal Constitution.

The Court of Appeals of Kentucky, in 1882, in *Nash* v. *Page,* 80 Kentucky, 539, 545, cited *Munn* v. *Illinois,* as applicable to the case of the proprietors of tobacco warehouses in the city of Louisville, and held that the character of the business of the tobacco warehousemen was that of a public employment, such as made them subject, in their charges and their mode of conducting business, to legislative regulation and control, as having a practical monopoly of the sales of tobacco at auction.

In 1884, the Supreme Court of Pennsylvania, in *Girard Storage Co.* v. *Southwark Co.,* 105 Penn. St. 248, 252, cited *Munn* v. *Illinois* as involving the rights of a private person, and said that the principle involved in the ruling of this court was, that where the owner of such property as a warehouse devoted it to a use in which the public had an interest, he in effect granted to the public an interest in such use, and must, therefore, to the extent thereof, submit to be controlled by the public for the common good, as long as he maintained that use.

In *Sawyer* v. *Davis,* 136 Mass. 239, in 1884, the Supreme Judicial Court of Massachusetts said that nothing is better established than the power of the legislature to make what are called police regulations, declaring in what manner prop-

erty shall be used and enjoyed and business carried on, with a view to the good order and benefit of the community, even though they may interfere to some extent with the full enjoyment of private property, and although no compensation is given to a person so inconvenienced; and *Munn* v. *Illinois* was cited as holding that the rules of the common law which had from time to time been established, declaring or limiting the right to use or enjoy property, might themselves be changed as occasion might require.

The Supreme Court of Indiana, in 1885, in *Brechbill* v. *Randall,* 102 Indiana, 528, held that a statute was valid which required persons selling patent rights to file with the clerk of the county a copy of the patent, with an affidavit of genuineness and authority to sell, on the ground that the State had power to make police regulations for the protection of its citizens against fraud and imposition; and the court cited *Munn* v. *Illinois* as authority.

The Supreme Court of Nebraska, in 1885, in *Webster Telephone Case,* 17 Nebraska, 126, held that when a corporation or person assumed and undertook to supply a public demand, made necessary by the requirements of the commerce of the country, such as a public telephone, such demand must be supplied to all alike, without discrimination; and *Munn* v. *Illinois* was cited by the prevailing party and by the court. The defendant was a corporation, and had assumed to act in a capacity which was to a great extent public, and had undertaken to satisfy a public want or necessity, although it did not possess any special privileges by statute or any monopoly of business in a given territory; yet it was held that, from the very nature and character of its business, it had a monopoly of the business which it transacted. The court said that no statute had been deemed necessary to aid the courts in holding that where a person or company undertook to supply a public demand, which was "affected with a public interest," it must supply all alike who occupied a like situation, and not discriminate in favor of or against any.

In *Stone* v. *Yazoo & Miss. Valley R. Co.,* 62 Mississippi, 607, 639, the Supreme Court of Mississippi, in 1885, cited

*Munn* v. *Illinois* as deciding that the regulation of warehouses for the storage of grain, owned by private individuals, and situated in Illinois, was a thing of domestic concern and pertained to the State, and as affirming the right of the State to regulate the business of one engaged in a public employment therein, although that business consisted in storing and transferring immense quantities of grain in its transit from the fields of production to the markets of the world.

In *Hockett* v. *The State,* 105 Indiana, 250, 258, in 1885, the Supreme Court of Indiana held that a statute of the State which prescribed the maximum price which a telephone company should charge for the use of its telephones was constitutional, and that in legal contemplation all the instruments and appliances used by a telephone company in the transaction of its business were devoted to a public use, and the property thus devoted became a legitimate subject of legislative regulation. It cited *Munn* v. *Illinois* as a leading case in support of that proposition, and said that although that case had been the subject of comment and criticism, its authority as a precedent remained unshaken. This doctrine was confirmed in *Central Union Telephone Co.* v. *Bradbury,* 106 Indiana, 1, in the same year, and in *Central Union Telephone Co.* v. *The State,* 118 Indiana, 194, 207, in 1888, in which latter case *Munn* v. *Illinois* was cited by the court.

In *Chesapeake & Potomac Telephone Co.* v. *Balto. & Ohio Telegraph Co.,* 66 Maryland, 399, 414, in 1886, it was held that the telegraph and the telephone were public vehicles of intelligence, and those who owned or controlled them could no more refuse to perform impartially the functions which they had assumed to discharge than a railway company, as a common carrier, could rightfully refuse to perform its duty to the public; and that the legislature of the State had full power to regulate the services of telephone companies, as to the parties to whom facilities should be furnished. The court cited *Munn* v. *Illinois,* and said that it could no longer be controverted that the legislature of a State had full power to regulate and control, at least within reasonable limits, public employments and property used in connection therewith; that

the operation of the telegraph and the telephone in doing a general business was a public employment, and the instruments and appliances used were property devoted to a public use and in which the public had an interest; and that, such being the case, the owner of the property thus devoted to public use must submit to have that use and employment regulated by public authority for the common good.

In the Court of Chancery of New Jersey, in 1889, in *Delaware &c. Railroad Co.* v. *Central Stock-Yard Co.*, 45 N. J. Eq. 50, 60, it was held that the legislature had power to declare what services warehousemen should render to the public, and to fix the compensation that might be demanded for such services; and the court cited *Munn* v. *Illinois* as properly holding that warehouses for the storage of grain must be regarded as so far public in their nature as to be subject to legislative control, and that when a citizen devoted his property to a use in which the public had an interest, he in effect granted to the public an interest in that use, and rendered himself subject to control, in that use, by the body politic.

In *Zanesville* v. *Gas-Light Company*, 47 Ohio St. 1, in 1889, it was said by the Supreme Court of Ohio, that the principle was well established, that where the owner of property devotes it to a use in which the public have an interest, he in effect grants to the public an interest in such use, and must to the extent of that interest submit to be controlled by the public for the common good, as long as he maintains the use; and that such was the point of the decision in *Munn* v. *Illinois*.

We must regard the principle maintained in *Munn* v. *Illinois* as firmly established; and we think it covers the present cases, in respect to the charge for elevating, receiving, weighing and discharging the grain, as well as in respect to the charge for trimming and shovelling to the leg of the elevator when loading, and trimming the cargo when loaded. If the shovellers or scoopers chose, they might do the shovelling by hand, or might use a steam-shovel. A steam-shovel is owned by the elevator owner, and the power for operating it is fur-

nished by the engine of the elevator; and if the scooper uses the steam-shovel, he pays the elevator owner for the use of it.

The answer to the suggestion that by the statute the elevator owner is forbidden to make any profit from the business of shovelling to the leg of the elevator is that made by the Court of Appeals of New York in the case of Budd, that the words "actual cost," used in the statute, were intended to exclude any charge by the elevator owner, beyond the sum specified for the use of his machinery in shovelling and the ordinary expenses of operating it, and to confine the charge to the actual cost of the outside labor required for trimming and bringing the grain to the leg of the elevator; and that the purpose of the statute could be easily evaded and defeated if the elevator owner was permitted to separate the services, and to charge for the use of his steam-shovel any sum which might be agreed upon between himself and the shovellers' union, and thereby, under color of charging for the use of his steam-shovel, to exact of the carrier a sum for elevating beyond the rate fixed by the statute.

We are of opinion that the act of the legislature of New York is not contrary to the Fourteenth Amendment to the Constitution of the United States, and does not deprive the citizen of his property without due process of law; that the act, in fixing the maximum charges which it specifies, is not unconstitutional, nor is it so in limiting the charge for shovelling to the actual cost thereof; and that it is a proper exercise of the police power of the State.

On the testimony in the cases before us the business of elevating grain is a business charged with a public interest, and those who carry it on occupy a relation to the community analogous to that of common carriers. The elevator owner, in fact, retains the grain in his custody for an appreciable period of time, because he receives it into his custody, weighs it, and then discharges it, and his employment is thus analogous to that of a warehouseman. In the actual state of the business the passage of the grain to the city of New York and other places on the seaboard would, without the use of eleva-

tors, be practically impossible. The elevator at Buffalo is a link in the chain of transportation to the seaboard, and the elevator in the harbor of New York is a like link in the transportation abroad by sea. The charges made by the elevator influence the price of grain at the point of destination on the seaboard, and that influence extends to the prices of grain at the places abroad to which it goes. The elevator is devoted by its owner, who engages in the business, to a use in which the public has an interest, and he must submit to be controlled by public legislation for the common good.

It is contended in the briefs for the plaintiffs in error in the Annan and Pinto cases that the business of the relators in handling grain was wholly private, and not subject to regulation by law; and that they had received from the State no charter, no privileges and no immunity, and stood before the law on a footing with the laborers they employed to shovel grain, and were no more subject to regulation than any other individual in the community. But these same facts existed in *Munn* v. *Illinois*. In that case, the parties offending were private individuals, doing a private business, without any privilege or monopoly granted to them by the State. Not only is the business of elevating grain affected with a public interest, but the records show that it is an actual monopoly, besides being incident to the business of transportation and to that of a common carrier, and thus of a quasi-public character. The act is also constitutional as an exercise of the police power of the State.

So far as the statute in question is a regulation of commerce, it is a regulation of commerce only on the waters of the State of New York. It operates only within the limits of that State, and is no more obnoxious as a regulation of interstate commerce than was the statute of Illinois in respect to warehouses, in *Munn* v. *Illinois*. It is of the same character with navigation laws in respect to navigation within the State, and laws regulating wharfage rates within the State, and other kindred laws.

It is further contended that, under the decision of this court in *Chicago &c. Railway Co.* v. *Minnesota*, 134 U. S. 418, the

fixing of elevator charges is a judicial question, as to whether they are reasonable or not; that the statute must permit and provide for a judicial settlement of the charges; and that, by the statute under consideration, an arbitrary rate is fixed and all inquiry is precluded as to whether that rate is reasonable or not.

But this is a misapprehension of the decision of this court in the case referred to. In that case, the legislature of Minnesota had passed an act which established a railroad and warehouse commission, and the Supreme Court of that State had interpreted the act as providing that the rates of charges for the transportation of property by railroads, recommended and published by the commission, should be final and conclusive as to what were equal and reasonable charges, and that there could be no judicial inquiry as to the reasonableness of such rates. A railroad company, in answer to an application for a mandamus, contended that such rates in regard to it were unreasonable, and, as it was not allowed by the State Court to put in testimony in support of its answer, on the question of the reasonableness of such rates, this court held that the statute was in conflict with the Constitution of the United States, as depriving the company of its property without due process of law, and depriving it of the equal protection of the laws. That was a very different case from one under the statute of New York in question here, for in this instance the rate of charges is fixed directly by the legislature. See *Spencer* v. *Merchant*, 125 U. S. 345, 356. What was said in the opinion of the court in 134 U. S. had reference only to the case then before the court, and to charges fixed by a commission appointed under an act of the legislature, under a Constitution of the State which provided that all corporations, being common carriers, should be bound to carry " on equal and reasonable terms," and under a statute which provided that all charges made by a common carrier for the transportation of passengers or property should be " equal and reasonable."

What was said in the opinion in 134 U. S., as to the question of the reasonableness of the rate of charge being one for judicial investigation, had no reference to a case where the

rates are prescribed directly by the legislature. Not only was that the case in the statute of Illinois in *Munn* v. *Illinois*, but the doctrine was laid down by this court in *Wabash &c. Railway Co.* v. *Illinois*, 118 U. S. 557, 568, that it was the right of a State to establish limitations upon the power of railroad companies to fix the price at which they would carry passengers and freight, and that the question was of the same character as that involved in fixing the charges to be made by persons engaged in the warehousing business. So, too, in *Dow* v. *Beidelman*, 125 U. S. 680, 686, it was said that it was within the power of the legislature to declare what should be a reasonable compensation for the services of persons exercising a public employment, or to fix a maximum beyond which any charge made would be unreasonable.

But in *Dow* v. *Beidelman*, after citing *Munn* v. *Illinois*, 94 U. S. 113; *Chicago, Burlington & Quincy Railroad* v. *Iowa*, 94 U. S. 155, 161, 162; *Peik* v. *Chicago & Northwestern Railway*, 94 U. S. 164, 178; *Chicago, Milwaukee & St. Paul Railroad* v. *Ackley*, 94 U. S. 179; *Winona & St. Peter Railroad* v. *Blake*, 94 U. S. 180; *Stone* v. *Wisconsin*, 94 U. S. 181; *Ruggles* v. *Illinois*, 108 U. S. 526; *Illinois Central Railroad* v. *Illinois*, 108 U. S. 541; *Stone* v. *Farmers' Loan & Trust Co.*, 116 U. S. 307; *Stone* v. *Illinois Central Railroad*, 116 U. S. 347; and *Stone* v. *New Orleans & Northeastern Railroad*, 116 U. S. 352, as recognizing the doctrine that the legislature may itself fix a maximum beyond which any charge would be unreasonable, in respect to services rendered in a public employment, or for the use of property in which the public has an interest, subject to the proviso that such power of limitation or regulation is not without limit, and is not a power to destroy, or a power to compel the doing of the services without reward, or to take private property for public use without just compensation or without due process of law, the court said that it had no means, " if it would under any circumstances have the power," of determining that the rate fixed by the legislature in that case was unreasonable, and that it did not appear that there had been any such confiscation of property as amounted to a taking of it without due process of law,

or that there had been any denial of the equal protection of the laws.

In the cases before us, the records do not show that the charges fixed by the statute are unreasonable, or that property has been taken without due process of law, or that there has been any denial of the equal protection of the laws; even if under any circumstances we could determine that the maximum rate fixed by the legislature was unreasonable.

In *Georgia Banking Co.* v. *Smith*, 128 U. S. 174, 179, in the opinion of the court, delivered by Mr. Justice Field, it was said that this court had adjudged in numerous instances that the legislature of a State had the power to prescribe the charges of a railroad company for the carriage of persons and merchandise within its limits, in the absence of any contract to the contrary, subject to the limitation that the carriage is not required without reward, or upon conditions amounting to the taking of property for public use without just compensation, and that what is done does not amount to a regulation of foreign or interstate commerce.

It is further contended for the plaintiffs in error that the statute in question violates the Fourteenth Amendment, because it takes from the elevator owners the equal protection of the laws, in that it applies only to places which have 130,-000 population or more, and does not apply to places which have less than 130,000 population, and thus operates against elevator owners in the larger cities of the State. The law operates equally on all elevator owners in places having 130,-000 population or more; and we do not perceive how they are deprived of the equal protection of the laws, within the meaning of the Fourteenth Amendment.

*Judgments affirmed.*


MR. JUSTICE BREWER, with whom concurred MR. JUSTICE FIELD and MR. JUSTICE BROWN, dissenting.


I dissent from the opinion and judgment in these cases. The main proposition upon which they rest is, in my judgment, radically unsound. It is the doctrine of *Munn* v. *Illinois*, 94

U. S. 113, reaffirmed. That is, as declared in the syllabus, and stated in the opinion, in that case: "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." The elaborate discussions of the question in the dissenting opinions in that case, and the present cases when under consideration in the Court of Appeals of the State of New York, seem to forbid anything more than a general declaration of dissent. The vice of the doctrine is, that it places a public interest in the use of property upon the same basis as a public use of property. Property is devoted to a public use when, and only when, the use is one which the public in its organized capacity, to wit, the State, has a right to create and maintain, and, therefore, one which all the public have a right to demand and share in. The use is public, because the public may create it, and the individual creating it is doing thereby and *pro tanto* the work of the State. The creation of all highways is a public duty. Railroads are highways. The State may build them. If an individual does that work, he is *pro tanto* doing the work of the State. He devotes his property to a public use. The State doing the work fixes the price for the use. It does not lose the right to fix the price, because an individual voluntarily undertakes to do the work. But this public use is very different from a public interest in the use. There is scarcely any property in whose use the public has no interest. No man liveth unto himself alone, and no man's property is beyond the touch of another's welfare. Everything, the manner and extent of whose use affects the well-being of others, is property in whose use the public has an interest. Take, for instance, the only store in a little village. All the public of that village are interested in it; interested in the quantity and quality of the goods on its shelves, and their prices, in the time at which it opens and closes, and, generally, in the way in which it is managed; in short, interested in the use. Does it follow that that village public has a right to control these matters? That

which is true of the single small store in the village, is also true of the largest mercantile establishment in the great city. The magnitude of the business does not change the principle. There may be more individuals interested, a larger public, but still the public. The country merchant who has a small warehouse in which the neighboring farmers are wont to store their potatoes and grain preparatory to shipment occupies the same position as the proprietor of the largest elevator in New York. The public has in each case an interest in the use, and the same interest, no more and no less. I cannot bring myself to believe that when the owner of property has by his industry, skill and money made a certain piece of his property of large value to many, he has thereby deprived himself of the full dominion over it which he had when it was of comparatively little value; nor can I believe that the control of the public over one's property or business is at all dependent upon the extent to which the public is benefited by it.

Surely the matters in which the public has the most interest, are the supplies of food and clothing; yet can it be that by reason of this interest the State may fix the price at which the butcher must sell his meat, or the vendor of boots and shoes his goods? Men are endowed by their Creator with certain unalienable rights, "life, liberty and the pursuit of happiness;" and to "secure," not grant or create, these rights governments are instituted. That property which a man has honestly acquired he retains full control of, subject to these limitations: First, that he shall not use it to his neighbor's injury, and that does not mean that he must use it for his neighbor's benefit; second, that if he devotes it to a public use, he gives to the public a right to control that use; and, third, that whenever the public needs require, the public may take it upon payment of due compensation.

It is suggested that there is a monopoly, and that that justifies legislative interference. There are two kinds of monopoly; one of law, the other of fact. The one exists when exclusive privileges are granted. Such a monopoly, the law which creates alone can break; and being the creation of law justifies legislative control. A monopoly of fact any one

can break, and there is no necessity for legislative interference. It exists where any one by his money and labor furnishes facilities for business which no one else has. A man puts up in a city the only building suitable for offices. He has therefore a monopoly of that business; but it is a monopoly of fact, which any one can break who, with like business courage puts his means into a similar building. Because of the monopoly feature, subject thus easily to be broken, may the legislature regulate the price at which he will lease his offices? So, here, there are no exclusive privileges given to these elevators. They are not upon public ground. If the business is profitable, any one can build another; the field is open for all the elevators, and all the competition that may be desired. If there be a monopoly, it is one of fact and not of law, and one which any individual can break.

The paternal theory of government is to me odious. The utmost possible liberty to the individual, and the fullest possible protection to him and his property, is both the limitation and duty of government. If it may regulate the price of one service, which is not a public service, or the compensation for the use of one kind of property which is not devoted to a public use, why may it not with equal reason regulate the price of all service, and the compensation to be paid for the use of all property? And if so, "Looking Backward" is nearer than a dream.

I dissent especially in these cases, because the statute in effect compels service without any compensation. It provides that the parties seeking the service of the elevator "shall only be required to pay the actual cost of trimming or shovelling to the leg of the elevator when unloading, and trimming cargo when loading." This work of trimming or shovelling is fully explained in the briefs of counsel. It is work performed by longshoremen with hand-scoops or shovels, on the vessel unloading or receiving the grain. They are not in the regular employ of the elevator; but engaged in an independent service, and yet one whose careful and skilful performance is essential to the successful transfer of grain into and through the elevator. The full service required of the elevator com-

pels its proprietor to employ and superintend the work of these longshoremen. For this work of employment, and superintendence, and for the responsibility for the proper performance of their work, the act says that the proprietor of the elevator shall receive no compensation; he can charge only that which he pays out, the actual cost. I had supposed that no man could be required to render any service to another individual without some compensation.

Again, in the Pinto Case, it appears that Mr. Pinto is the owner of a stationary elevator, built on private grounds. It is not on grounds devoted to a public use, like the right of way of a railroad company. There is nothing to indicate on his part a purpose to dedicate his property to public uses. So far as it is possible to make the business of an elevator a purely private business, he has done so. It will not do to say that the transferring of grain through an elevator is one step in the process of transportation; and that, therefore, they are *quasi* common carriers, discharging a public duty, and subject to public control. They are not carriers in any proper sense of the term. They may facilitate carriage; so does the boxing and packing of goods for transportation. The engineers, firemen, brakemen, and all the thousands of employés of a railroad company are helping the business of transportation; but are they all common carriers simply because their work tends to facilitate the business of transportation; and may the legislature regulate their wages?

But, as I said, I do not care to enter into any extended discussion of the matter. I believe the time is not distant when the evils resulting from this assumption of a power on the part of government to determine the compensation a man may recieve for the use of his property, or the performance of his personal services, will become so apparent that the courts will hasten to declare that government can prescribe compensation only when it grants a special privilege, as in the creation of a corporation, or when the service which is rendered is a public service, or the property is in fact devoted to a public use.

Mr. Justice Field and Mr. Justice Brown concur with me in this dissent.