THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE CONNECTING TERMINAL RAILROAD COMPANY, Appellant, v. NATHAN L. MILLER, as Comptroller of the State of New York, Respondent.

TAX — EARNINGS OF AN INTERSTATE CHARACTER, BY A DOMESTIC CORPORATION, ARE NOT SUBJECT TO FRANCHISE TAX. The earnings of a domestic corporation, organized under the General Railroad Act, derived exclusively from the transportation of property in transit from one state to another, in conveying it by means of elevators and railroad tracks from boats on Lake Erie to railroad cars in the city of Buffalo and *vice versa*, are "earnings derived from business which is of an interstate character," within the meaning of the statutes which forbid the imposition of any tax upon the business of interstate commerce (L. 1894, ch. 562, § 11; L. 1896, ch. 908, § 184), and are not subject to the franchise tax imposed by the act of 1880 as amended. (L. 1880, ch. 542, § 6; L. 1881, ch. 361; L. 1896, ch. 908, § 184.)

*People ex rel. Connecting Terminal R. R. Co.* v. *Miller*, 84 App. Div. 174, reversed.

(Argued February 8, 1904; decided April 8, 1904.)

APPEAL from an order of the Appellate Division of the Supreme Court in the third judicial department, entered May 19, 1903, which affirmed a determination of the defendant assessing a franchise tax against the relator.

The facts, so far as material, are stated in the opinion.

1904.]    People ex rel. C. T. R. R. Co. *v.* Miller.    195

'N. Y. Rep.]      Opinion of the Court, per O'Brien, J.

*Henry Galbraith Ward* and *Sidney Ward* for appellant. The relator is a transportation company, and its gross earnings are wholly derived from interstate business, and, therefore, the tax levied on them by the comptroller is violative of the Constitution of the United States. (*Kelley* v. *Rhoads,* 188 U. S. 1; *W., etc., R. R. Co.* v. *Illinois,* 118 U. S. 557.)

*John Cunneen, Attorney-General* (*William H. Wood* on the brief), for respondent. The earnings of the relator are not "derived from business of an interstate character" within the meaning of those terms as used in section 184 of the Tax Law, and the tax imposed by the comptroller is valid. (*Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 U. S. 517; *Brass* v. *North Dakota,* 153 U. S. 391; *People* v. *Budd,* 117 N. Y. 1; *People* v. *Knight,* 171 N. Y. 354.)

O'Brien, J.    On the sixth day of June, 1900, the comptroller of this state imposed a tax upon the gross earnings of the relator, amounting to eleven thousand five hundred and thirty-seven dollars and twenty-seven cents, together with a penalty of one thousand one hundred and fifty-three dollars and seventy-three cents, amounting in all to twelve thousand six hundred and ninety-one dollars, for taxes claimed to have accrued to the state for seventeen years previous to that date, under the amendatory act, section 184 of chapter 908 of the Laws of 1896. This was the first occasion when the state claimed the right to impose a franchise tax, as it is called, upon the relator. The relator filed a petition with the comptroller, asking him to revise and cancel the tax on the ground that it was in violation of the Constitution of the United States, which confers upon Congress the power to regulate commerce with foreign nations and among the several states, and that it was in violation of the provisions of the law of this state, and especially of section eleven of chapter 562 of the Laws of 1894 and chapter 908 of the Laws of 1896, section 184, which in effect forbid the imposing of any tax upon the business of interstate commerce.

196    People ex rel. C. T. R. R. Co. *v.* Miller.    [April,

Opinion of the Court, per O'Brien, J.    [Vol. 178.

The relator, in its petition, stated that it was a domestic corporation organized under the laws of this state authorizing the formation of railroad companies, passed April 2, 1850, and the several acts supplementary to or amendatory thereof, the object of said corporation being for the business of conducting and operating a railroad for the purposes provided by said statutes. It was also alleged that the entire business of said corporation consists in the transportation of personal property, consisting of grain and other products, from ports outside of the state of New York to ports and places in the state of New York and of personal property carried by the petitioner from ports in the state of New York to ports in other states and that its entire gross receipts from its business are derived from such transportation and not otherwise; and that no part of said business and no part of its gross receipts are for local business carried on in this state and that all of the business of the petitioner being of the character above mentioned the levy of such assessment or tax by the comptroller is contrary to the provisions of the Constitution and laws of the United States and is, therefore, not justified to any extent whatever. These allegations of fact are not denied in the return of the comptroller, and, hence, they stand admitted upon the record and the only question presented by this appeal is as to the legal effect of these undisputed facts upon the tax or demand which the state has imposed upon the relator. It appears that the relator owns a piece of land of the width of about sixteen hundred and fifty feet, fronting on the Niagara river in the city of Buffalo, upon which it has a grain elevator and freight warehouse and several lines of railroad tracks. These tracks are used to afford facilities for access to its elevator and warehouse by cars owned by other companies and for loading and unloading such cars. It owns no engines, cars or boats. The entire business is transacted in Buffalo and consists in loading and unloading and storing grain and other freights which, on the one hand, come from places outside of the state and are destined for points in the state or elsewhere; and, on the other,

which come from points in the state and are destined to places in other states. It handles no local freight whatever. All its receipts are from such business and come from the payment to it by the several companies or carriers who employ it of fixed charges per bushel on the grain handled and a fixed rate per ton on the package freight, which charges include elevator service and the use of the yards for car storage and car service over its tracks. These charges also cover a ten days' storage privilege and for freights remaining longer than that an additional storage charge is made. The shortest storage privilege is about ten days and the longest about three months. This work is done by the relator for various railroad and other transportation companies having terminals on Buffalo harbor.

It is somewhat difficult at first view to consider the relator as a transportation company, but inasmuch as it has incorporated and exists under the General Railroad Law it must, I think, for all the purposes of this case be considered as a corporation of that character. Its principal business operations consist in the transshipment of grain which it takes into its elevator from boats or water craft upon the river or lake and discharges into cars to be carried by railroads to New York or other ports on the Atlantic seaboard. In this way it moves the freight or property, whatever it may consist of, about five hundred feet and only that part of the route is covered by the relator's operations, whether the freight is destined for the east or the west. It may be assumed from the nature of the business that the property is carried under bills of lading from the point of shipment to the point of ultimate destination and the relator is employed by the carriers to aid in the transshipment of the property at Buffalo. Looking at the transactions of the relator in a general way the mind readily arrives at the conclusion that it is engaged in the business of interstate commerce within the fair meaning of the law, but when we come to an examination of the cases on this question the conclusion may not be so clear. There is great difficulty in determining from the authorities what operations are and what are not interstate commerce.

A reference to a few of the cases will show the perplexities that beset the subject at almost every point. In *Munn* v. *Illinois* (94 U. S. 113) it was held that a state law regulating the charges of elevators in Chicago, engaged in the business of storing and delivering grain to carriers for transportation to ports and places in other states, was not in conflict with the commerce clause of the Federal Constitution. That decision was subsequently reaffirmed and followed when the validity of a similar statute of this state was before the court. (*Budd* v. *New York*, 143 U. S. 517.) It has been held that a state statute regulating the freight charges of railroads upon property delivered to the railroad in one state to be transported to another state under one contract and by one voyage was an unauthorized interference with interstate commerce. (*Wabash, St. L. & P. Ry. Co.* v. *Illinois*, 118 U. S. 557.) It was held that a state statute requiring railroad corporations operating railroads within the state to pay an annual franchise tax based upon its gross receipts was valid, although the railroad in that case was partly within and partly without the state and was operated as a part of a line or system extending beyond the state and into other states. (*Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217.) So, it was held that a state tax upon the gross receipts upon a steamship company incorporated under its laws derived from the transportation of persons and property by sea between different states and to and from foreign countries was a regulation of interstate and foreign commerce in conflict with the exclusive powers of Congress under the Constitution. (*Phila. & Southern S. S. Co.* v. *Penn.*, 122 U. S. 326.) It has just been decided by the same court that a cab service maintained and operated in the city of New York by the Pennsylvania Railroad Company for the purpose of transporting to various points therein its passengers conveyed to that city by ferry from its railroad terminus in an adjoining state was taxable upon its gross receipts under a state law, the service beginning and ending in the city of New York, not being a part of the interstate commerce transacted by the railroad corporation, and that the capital employed by it in the

maintenance of such cab service is not exempt from the taxation imposed by the statute of this state relating to franchise taxes upon corporations. The final conclusion of the court in the case was that the business was an independent local service, preliminary or subsequent to interstate transportation. That decision affirmed the judgment of this court in the case of *People ex rel. Penn. R. R. Co.* v. *Knight* (171 N. Y. 354). It has been held that this same railroad company, whose lines extend into other states but not into this state, operating in connection with its road a ferry across the Hudson river to the city of New York, where it has terminal facilities used in receiving and delivering freight and passengers, collecting in that city the money due for transportation of freight to and from it and selling therein passenger tickets, employing a large number of clerks and laborers, was engaged in interstate commerce and its operation in the city of New York was of that character and that it was not taxable by this state upon such business. I am not aware that this decision has ever been questioned. (*People ex rel. Penn. R. R. Co.* v. *Wemple*, 138 N. Y. 1.) The difficulty of formulating from these decisions, apparently in conflict with each other, any rule or principle to govern this case must be quite apparent. In this condition of the authorities the best that we can do is to state briefly what seems to us to be the reasonable view of the law on this subject when applied to the facts of the case.

There is one feature of the case, as to which there is no conflict in the authorities, and that is that interstate commerce cannot be taxed or burdened or restricted in any way by state laws, and the only question that we have to deal with now is whether the relator's operations are such that they can be held to be the transaction of the business of interstate commerce. Fortunately, there is no dispute about the facts of the case so far as they describe the relator's business. They have already been stated, and they stand admitted in the record. It is quite true that all of its operations are conducted within the state of New York, but I apprehend that the circumstance does not show that the business is something other than inter-

state commerce.   We have the other fact that it is engaged in no local business whatever, and that it is but a mere link in the chain of transportation of grain and other property from the western states to the seaboard and from the east to the west.   If, as the court of last resort with respect to such questions has often held, interstate commerce consists in intercourse and traffic between the states, either by navigation or otherwise, for the transportation of persons and property and the purchase, sale and exchange of commodities, the relator's operations would seem to fall fairly within that definition. What the relator does with respect to the property in transit from one state to another is just as essential and substantial a part of the process of interstate transportation as anything else that it does, or can be done, in order to complete the carriage of goods by water and by land from one state to another state. Indeed, except for the important part that the relator takes in the process of transportation, the commercial intercourse described in the record could not take place at all.   The first part of the route in the process of transportation is covered by water craft upon the lakes and the last part by railroads, but, between these two links in the line of transportation, the relator's operations, which are not independent or local, but a part, and most essential part, of the process of transporting property by the owner in one state to the purchaser or consignee in another state, intervene.   Hence the relator's earnings upon which the tax in question was imposed would plainly appear to be derived from the business of interstate commerce.   (*McCall v. California*, 136 U. S. 104.)

But, whatever the rule of the Federal court may be with respect to such a case as this, we have another guide, and that is, the words of our own statute under the authority of which the tax in question was imposed.   That statute, in terms, defines the gross earnings that are subject to the tax, and declares that they " shall in no event include earnings derived from business which is of an interstate character," and in adjusting such taxes the state officers are commanded to exclude all the earnings " of an interstate character."   The

question, then, is whether the earnings of the relator upon which the tax in question was imposed were " derived from business which is of an interstate character," or were " earnings of an interstate character." The *character* of the earnings must be interstate unless they are purely local, and the record, as we have seen, admits that they arc *not* local. Independent of this admission, however, it would seem to be a reasonably plain proposition that the relator's earnings derived from the transportation of property in transit from one state to another, that is to say, in conveying it by means of elevators and railroad tracks from the boats on the lake to the railroad cars on the land, are " earnings of an interstate *character*," and it can make no difference in principle whether the distance over which the property was so conveyed was five hundred feet or a mile.

The order appealed from should be reversed, with costs, and the assessment canceled.

PARKER, Ch. J. I concur with Judge O'BRIEN as to that portion of the tax which was levied after the enactment of chapter 562, Laws 1894, for while this is an excise tax imposed on the corporation as authority for it to do business, the statute expressly prohibits the inclusion in the estimate of gross earnings for the basis of taxation " earnings derived from business which is of an interstate character." The tax for the years subsequent to 1894 seems to me to be levied on that basis, and upon no other.

As to so much of the tax, however, as was assessed upon relator for the years prior to 1894, and levied by virtue of section 6, chapter 361, Laws 1881, it seems to me the levy could stand under the authorities. That section authorizes a tax upon its corporate franchise and business in this state at the rate of five-tenths of one per centum upon the gross earnings within this state of said corporation or company or association. This court holds in *People* v. *Equitable Trust Co.* (96 N. Y. 388) that when such a tax is imposed on a *domestic* corporation it is a tax on its corporate franchise;

202    People ex rel. C. T. R. R. Co. *v.* Miller.    [April,

Opinion per Parker, Ch. J.    [Vol. 178.

when imposed on a foreign corporation it is a tax on its business, a distinction based on the fact that corporate franchises are only taxable within the jurisdiction which creates them, and where alone they can be said to have a *situs.* This holding is affirmed in terms in *People ex rel. Penn. R. R. Co.* v. *Wemple* (138 N. Y. 1, 8). Very recently we had before this court *People ex rel. U. S. Aluminium P. P. Co.* v. *Knight* (174 N. Y. 475) in which it is unanimously held that the capital of domestic corporations invested in letters patent, United States bonds or copyrights may be appraised for the purpose of ascertaining the amount of the franchise tax the same as other property. Judge Vann, in speaking of certain cases, says (174 N. Y. 482) that "they involve the principle that while a tax cannot be assessed upon property that is exempt by act of Congress, it may be imposed upon the franchise of a corporation to which such exempt property belongs and may be measured by the value thereof." Why does not the principle of that case apply to so much of this one as involves the tax prior to 1894? The state has no right to tax United States bonds, patent rights, copyrights or interstate commerce, but it may place an excise tax upon a domestic corporation for its right to do business as a corporation, and in measuring the amount of such tax there may be taken into consideration, as we hold in that case, the value of government bonds, patents or copyrights although non-assessable as such by the state. Why, therefore, may not be taken into consideration, in measuring the amount of an excise tax assessed as an authority for the corporation to do business in the state, the volume of interstate commerce business done by it?

But one answer to the question could result, it seems to me, from a careful reading of the statute of 1881 in the light of the authorities cited, but those of my associates that agree that the earnings of this corporation are of an interstate character are of the opinion that inasmuch as § 184 of the Tax Law, passed in 1894, provides that the comptroller shall settle the taxes levied under the act of 1881 for the two years immediately preceding 1894 by excluding the earnings of an

interstate character, the legislature intended to prevent the collection of past taxes based on such earnings. As intention must be gleaned from the language of the statute it is difficult to reach that conclusion by the application of any of the rules of statutory construction inasmuch as the provision referred to embraces only the two years immediately preceding 1894. But as the legislature may have assumed that the taxes prior to that time had been collected I shall for the purpose of making a decision concur in the result reached by Judge O'BRIEN.

GRAY, J.   I shall concur with the opinion of Judge O'BRIEN. The acts of 1894 and of 1896, which conferred authority upon the comptroller to impose additional franchise taxes, by their terms, direct that officer " in no event, to include earnings derived from business which is of an interstate character." If that officer cannot impose the tax upon the relator's earnings since these enactments, I think he is quite without authority in this proceeding to impose taxes for the years prior thereto upon earnings of the relator derived from business of an interstate character.

CULLEN, J. (dissenting). So far as the claim is made that the tax imposed on the relator is in conflict with the Federal Constitution I assume that the decisions of the Supreme Court of the United States are conclusive upon us. Such is certainly their effect so far as they declare state regulations of commerce to be invalid. It may be that if a state court should hold a statute of the state repugnant to the Federal Constitution in a case in which similar statutes had been held by the Supreme Court not to be repugnant, the decision would not be subject to review by the Supreme Court. But, granting this, the action of the state court would be wholly unreasonable. Now, if the appellant's contention is to be determined by the decisions of the Supreme Court of the United States it may be summarily disposed of by a very short syllogism. In the case of interstate transportation the legislature of a state cannot prescribe the charge to be made even for the

204    People ex rel. C. T. R. R. Co. *v.* Miller.    [April,

Dissenting opinion, per Cullen, J.    [Vol. 178.

part of the transportation within the state.  (*Wabash, St. L. & P. Ry. Co.* v. *Illinois,* 118 U. S. 557.)  But the state can prescribe the charges to be exacted for services by the Buffalo elevators engaged like that of the relator in the transfer of grain from lake vessels to warehouses or cars.  (*Budd* v. *New York,* 143 U. S. 517.)  Therefore, the services of such elevators do not constitute part of interstate transportation.

I am frank to say that oftentimes, especially in the development of new principles of law or in their application to new states of fact, the greatest and wisest of courts may not be able to foresee to what extent the logic of its doctrine will carry it nor to state the limits and qualifications of that doctrine.  It might, therefore, lead to an erroneous result to select two propositions determined by a court between which decisions there had intervened a long period of time and each of which might be made without appreciating its bearing on the other and from those propositions to deduce a third as a necessary conclusion.  But the present case is free from any such source of error.  The doctrine of the *Wabash* case was reaffirmed by the Supreme Court in *Covington & C. Bridge Company* v. *Kentucky* (154 U. S. 204) and the case is cited with approval to this day.  The *Budd* case was decided on the authority of *Munn* v. *Illinois* (94 U. S. 113) which is the pioneer case on the subject and was itself reaffirmed in *Brass* v. *North Dakota* (153 U. S. 391).  In the last case it was said by Justice Shiras delivering the opinion of the court: "In the cases thus brought to this court from the States of Illinois and New York (*Munn* and *Budd* cases) we were asked to declare void statutes regulating the affairs of grain warehouses and elevators within those States, and held valid by their highest courts, because it was claimed that such legislation was repugnant to that clause of the eighth section of article 1 of the Constitution of the United States, which confers upon Congress power to regulate commerce with foreign nations and among the several States, and to the Fourteenth Amendment, which ordains that no State shall deprive any person of life, liberty, or property without due process of law, nor deny

1904.]    People ex rel. C. T. R. R. Co. v. Miller.    205

N. Y. Rep.]        Dissenting opinion, per Cullen, J.

to any person within its jurisdiction the equal protection of
the law." It is clear that the objection that a state statute
prescribing the charges of elevators and warehouses could not
be upheld if such services constitute a part of interstate com-
merce was present in the mind of the court when it decided
the elevator cases, though the dominant question in those
cases was the alleged invasion of private property rights. In the
*Munn* case it was said : "It was very properly said in the case
of the *State Tax on Railway Gross Receipts* (15 Wall. 284)
that 'it is not everything that affects commerce that amounts
to a regulation of it, within the meaning of the Constitution.'
The warehouses of these plaintiffs-in-error are situated and their
business carried on exclusively within the limits of the State
of Illinois. They are used as instruments by those engaged in
State as well as those engaged in interstate commerce, but they
are no more necessarily a part of commerce itself than the
dray or the cart by which, but for them, grain would be
transferred from one railroad station to another. Incidentally
they may become connected with interstate commerce, but
not necessarily so. Their regulation is a thing of domestic
concern, and, certainly, until Congress acts in reference to
their interstate relations, the State may exercise all the pow-
ers of government over them, even though in so doing it may
indirectly operate upon commerce outside its immediate juris-
diction." In connection with the *Budd* case there was
argued and decided in the Supreme Court of the United
States the case of *New York ex rel. Annan* v. *Walsh.*
Annan was the owner of floating elevators which were moved
from point to point in the harbor of New York, and it was in
this respect only that his case differed from that of Budd. Of
such floating elevators the court said : "So far as the statute
in question is a regulation of commerce, it is a regulation of
commerce only on the waters of the State of New York. It
operates only within the limits of that State, and is no more
obnoxious as a regulation of interstate commerce than was
the statute of Illinois in respect to warehouses, in *Munn* v.
*Illinois.* It is of the same character with navigation laws in

respect to navigation within the State, and laws regulating wharfage rights within the State, and other kindred laws." There was a vigorous dissent in the *Budd* case, but the dissent proceeded solely on the ground that the state statute before the court was an invasion of private property. Of the nature of elevator services Judge Brewer said : " It will not do to say that the transferring of grain through an elevator is one step in the process of transportation, and that, therefore, they are *quasi* common carriers, discharging public duty, and subject to public control. They are not carriers in any proper sense of the term. They may facilitate carriage ; so does the boxing and packing of goods for transportation." There is nothing in the case of this relator that distinguishes it from those of Munn, Budd, Annan and Brass. The fact that the grain elevated or stored was on its journey from points without the state to points within the state or to points beyond the state was present in those cases as in this. Indeed, the argument of the majority of the court in the *Budd* case in support of the right of the state to prescribe the rate of elevator charges proceeded largely on the circumstance that 120 millions of bushels of grain were annually shipped to Buffalo from the west, and after transportation through the state, either by canal or railroad, a large part of it was, by the use of the floating elevators, transferred to ships to be distributed in the markets of the world. It may be true that the grain is carried on through bills of lading, though that fact does not appear in the record. But to those bills of lading, whatever their character, the relator is a stranger. The evidence is, " in 1901 we handled through the elevator about ten million bushels of grain, the records of which were entirely with the Lehigh Valley Railroad ; we had no bills of lading ; we knew nothing of the grain at all except as we received directions from the Lehigh Road ; the Lehigh Valley would have all the information, of course." The services of the relator were rendered not under the terms of a through bill of lading, but under a contract with the railroad company or navigation company, were performed entirely within this state, and the price charged

included an option of ten days' storage in the warehouse, though the time of storage might be increased on payment of an additional charge. It thus appears that the business of this relator does not differ from that of other elevator owners and warehousemen in Buffalo, nor is it distinguishable in character from the work performed by stevedores in unloading vessels. It is true the grain is moved by the operations of the elevator a distance of about five hundred feet horizontally. In this respect, however, the elevator does not differ from every crane or derrick on a wharf by which a cargo is moved at least from the hatchway to the pier. To the foregoing authorities may be added the declaration of the general doctrine on the subject found in *Covington & C. Bridge Company* v. *Kentucky* (154 U. S. 204): "As was said by Mr. Justice MILLER in the *Wabash* case: 'It is impossible to see any distinction in its effect upon commerce of either class between a statute which regulates the charges for transportation and a statute which levies a tax for the benefit of the State upon the same transportation;'" that is to say, the power of a state to tax and the power to regulate charges are coextensive.

If I have rightly interpreted the authorities cited it may safely be said to be the settled law of the Supreme Court of the United States that the work done by the relator is not of an interstate character. While the question before us arises under our own statute, I think that that statute is to be interpreted in the light of the Federal decisions, since the action of the legislature in exempting a business of an interstate character in computing the liability of the relator to taxation was undoubtedly dictated by the consideration that interstate commerce was under the control of Congress, and it could not have been intended to except any transportation or commerce as of an interstate character except such as the Federal courts might hold to be under the Constitution of the United States within the control of Congress. Moreover, I do not see how we can hold that the work of the relator is of an interstate character without overruling the decision of this court in the *Budd* case (*People* v. *Budd*, 117 N. Y. 1), for if the elevation and

transfer of grain is a part of interstate commerce, the legislature of the state cannot prescribe the charge to be made therefor. If these views are correct, it is unnecessary to further discuss the nature and character of elevator and warehouse services.

The order appealed from should be affirmed, with costs.

HAIGHT, J., concurs with O'BRIEN, J.; PARKER, Ch. J., and GRAY, J., in memoranda concur in result with O'BRIEN, J.; MARTIN and VANN, JJ., concur with CULLEN, J.

Order reversed.