## SCHOEN BROTHERS INCORPORATED *v.* PYLANT.

1. The ordinance of the City of Atlanta, which provides that "Every licensed slaughter-house shall slaughter for the public without discrimination," is valid, and it was competent for the municipal authorities of that city to pass such an ordinance in the exercise of the police power.
2. And where an individual or corporation operates such a licensed slaughter-house as that contemplated by the ordinance, for the slaughtering of animals for food within the limits of the City of Atlanta, and arbitrarily and without cause refuses to slaughter animals for a member of the public, to the injury and damage of the person offering animals to be slaughtered, the latter may maintain a suit for the recovery of damages.

No. 5365. JULY 15, 1926.

Certiorari; from Court of Appeals. 35 *Ga. App.* 133.

*W. W. Visanska, Bond Almand,* and *Branch & Howard,* for plaintiff in error.

*James W. Austin* and *Archibald H. Davis,* contra.

BECK, P. J. This case originated in the city court of Atlanta, where J. T. Pylant filed suit against Schoen Brothers Inc., and alleged, in substance, that the defendant had damaged him in a stated sum, "for that the defendant controlled and operated in the City of Atlanta a licensed abattoir, where it engaged in the business of slaughtering beeves, sheep, and other animals for hire, and in the storage of meats, and the defendant's abattoir consisted of extensive structures, amply equipped for the handling of the business of slaughtering animals and the treatment and storage of meats for the public in Fulton County, Georgia, and that the defendant furnished offices and headquarters for the wholesale deal-

Animals, 3 C. J. p. 188, n. 46.
Municipal Corporations, 28 Cyc. p. 730, n. 79.

ers engaged in buying and slaughtering animals and the vending of meats at the said abattoir of defendant, and that the hire and rates to be charged by the defendant for such services was fixed by ordinance of the City of Atlanta; that the defendant was the only licensed slaughter-house serving the public in Fulton County, there being no other licensed public abattoir therein, and that the defendant handled all of the business of slaughtering animals for the public in Fulton County and in the City of Atlanta; and that defendant's business is regulated by statute under the police power of the State and is regulated and controlled by an ordinance of the City of Atlanta, which provides that every licensed slaughter-house shall slaughter for the public without discrimination, and for the charges fixed by the ordinance; that the defendant's business was affected with a public interest and constituted the defendant a quasi-public corporation, with the duties and obligations incident to such a corporation; that the plaintiff, a wholesale butcher and vendor of meats in Fulton County, was arbitrarily and without cause refused service by the defendant, and that this was a breach of the defendant's legal duty toward the plaintiff."

The defendant filed general and special demurrers to the petition. The demurrers were sustained, and the plaintiff's petition was dismissed. The case was carried to the Court of Appeals, and the decision of that court, rendered on February 26, 1926, is to the effect that the judgment sustaining the general demurrer was erroneous, and that the petition as against the general demurrer set forth a cause of action; the Court of Appeals in effect holding that the ordinance of the City of Atlanta providing that every licensed slaughter-house shall slaughter for the public without discrimination is valid, and that the City of Atlanta has the charter power to enact such ordinance under the general welfare clause in its charter. The plaintiff in certiorari excepts to and assigns error upon so much of the decision of the Court of Appeals as holds that the ordinance of the City of Atlanta which provides that every licensed slaughter-house shall slaughter for the public without discrimination is valid, and that one who operates a licensed slaughter-house for the slaughter of animals, for hire, within the limits of the City of Atlanta, and who arbitrarily and without cause refuses to slaughter for a member of the public, is liable in damages therefor, and that the petition set out a cause of action and

was good as against a general demurrer. The rulings upon the special demurrers were not excepted to in the application for certiorari.

We are of the opinion that the ruling made by the Court of Appeals upon the question now under review was correct and stated sound and established doctrine. The ruling made by that court is not elaborated. Doubtless the judge writing the opinion deemed it unnecessary to enter upon an elaborate discussion of the question involved, because of the large number of adjudicated cases dealing with the same or similar questions. The full decision of the Court of Appeals upon that question, which was rendered by Judge Stephens is as follows: "The general welfare clause in the charter of a municipality authorizes the passage of reasonable ordinances for the protection, comfort, and good government of all the people of the municipality. *Crum* v. *Bray,* 121 *Ga.* 709 (49 S. E. 686, 1 Ann. Cas. 991). Under the authority of the general welfare clause a municipality may, in the interest of the public health, regulate or even perhaps prohibit entirely within its limits the business of slaughtering animals for food. Since a municipality might find it to be in the interest of the public health to discourage or even prohibit entirely within its limits the private slaughter of animals, it is a reasonable regulation to provide that those slaughtering for the public do so without discrimination. An ordinance of the City of Atlanta which provides that ' every licensed slaughter-house shall slaughter for the public without discrimination ' is a reasonable regulation, in the interest of the comfort and convenience of all the people of the city, and is valid under the general welfare clause in the charter of the city. It follows, therefore, that the owner and proprietor of a licensed slaughter-house operating under the authority of the City of Atlanta, whose business consists in slaughtering animals for their owners for a service charge, can not arbitrarily and without just cause refuse to render such service to any member of the public offering animals for slaughter. This being a suit against the operator of a licensed slaughter-house in the City of Atlanta, by a plaintiff who alleges that he was a butcher and vendor of meat in the community, and that the defendant, arbitrarily and without just cause, refused, to the plaintiff's damage in the destruction of his business, to slaughter animals offered by the plain-

tiff, in violation of the provisions of an ordinance of the city prohibiting such discrimination, the petition set out a cause of action and was good as against general demurrer."

For a learned and authoritative discussion of the principle underlying the decision which we have under review, we turn almost instinctively to the Slaughter-House Cases decided by the Supreme Court of the United States in the year 1872. 16 Wall. 36 (21 L. ed. 394). Those cases grew out of an act of the legislature of the State of Louisiana, entitled "An act to protect the health of the City of New Orleans, to locate the stock landings and slaughter-houses, and to incorporate 'The Crescent City Live-Stock Landing and Slaughter-House Company.'" The first holding in those cases was that "this grant of exclusive right or privilege, guarded by proper limitation of the prices to be charged, and imposing the duty of providing ample conveniences, with permission to all owners of stock to land and of all butchers to slaughter at those places, was a police regulation for the health and comfort of the people (the statute locating them where health and comfort required), within the power of the State legislatures, unaffected by the constitution of the United States previous to the adoption of the thirteenth and fourteenth articles of amendment." And it also said: "It is not necessary to inquire here into the full force of the clause forbidding a State to enforce any law which deprives a person of life, liberty, or property without due process of law, for that phrase has been often the subject of judicial construction, and is, under no admissible view of it, applicable to the present case." In the course of the opinion Mr. Justice Miller said: "It is, however, the slaughter-house privilege, which is mainly relied on to justify the charges of gross injustice to the public, and invasion of private right. It is not and can not be successfully controverted, that it is both the right and the duty of the legislative body—the supreme power of the State or municipality—to prescribe and determine the localities where the business of slaughtering for a great city may be conducted. To do this effectively it is indispensable that all persons who slaughter animals for food shall do it in those places and *nowhere else*. The statute under consideration defines these localities and forbids slaughtering in any other. It does not, as has been asserted, prevent the butcher from doing his own slaughtering. On the

contrary, the Slaughter-House Company is required, under a heavy penalty, to permit any person who wishes to do so, to slaughter in their houses; and they are bound to make ample provision for the convenience of all the slaughtering for the entire city. The butcher then is still permitted to slaughter, to prepare, and to sell his own meats; but he is required to slaughter at a specified place and to pay a reasonable compensation for the use of the accommodations furnished him at that place."

In the case of State v. Edwards, 86 Me. 102 (29 Atl. 947, 25 L. R. A. 504, 41 Am. St. R. 528), it was said: "Where the defendants operated a public grist-mill erected under the mill act, offering to grind grain for all comers, *held,* that they have dedicated their mill to public use, and must comply with legislative regulations of its use, so long as they keep their mill public." This ruling, taken from the syllabus in the case last referred to, indicates the character of the question involved. It appears that the defendants were convicted, first, of refusing to receive grain at their grist-mill there tendered to be ground; second, of taking excessive toll. In discussing the exceptions taken by the defendant to the ruling of the court that they were bound to receive the grist of grain offered, the Supreme Court of Maine said: "It is conceded by all authorities that the public use of property by the individual is within the scope of legislative control. And it matters not whether the use be authorized by express statute or dedicated by the individual proprietor. If it be a public use, it is within the supervision and control of the legislature. The troublesome question is, whether the use be public. Tyler v. Beacher, 44 Vt. 648 [8 Am. R. 398]. In most branches of business the public has an interest. That interest varies according to the surrounding conditions of the particular business in question. If it be a monopoly, the interest of the public to be fairly and conveniently served is much greater than when the monopoly ends by force of wholesome competition. A distinction must be made between a public use and a use in which the public has an interest. In the former case the public may control, because it is a use within the function of government to establish and maintain. In the latter case it is a private enterprise that serves the public and in which it is interested to the extent of its necessities and convenience. The former is clearly within the control of the legisla-

ture, while the latter may not be. Many authorities, however, go
to that extent. Munn *v.* Illinois, 94 U. S. 113; Budd *v.* New
York, 143 U. S. 517, and cases cited." See also Wartman *v.*
Philadelphia, 33 Pa. 202. The Supreme Court of Washington, in
the case of City of Spokane *v.* Robison, 6 Wash. 547 (33 Pac.
960), has held that "A slaughter-house, as it is generally con-
ducted, is notoriously offensive to the senses, and, we have no
doubt, was one of the occupations especially contemplated by the
legislature when the power was conferred on the cities. Nor do
we think that the enactment of subdivision 34 destroys any of the
force of the language used or power conferred in subdivision 22.
The vital question in this case, viz., the constitutional right of the
city to exercise the power as a police regulation, has been so ex-
haustively argued by the Supreme Court of the United States in
the noted Slaughter-House Cases, reported in 16 Wall. 46, that the
law may be considered as settled in favor of the validity of such
power, and it would be but a work of supererogation to discuss this
subject at length. Our conclusion is that the city had the power
to pass the ordinance; that the appellant was legally charged and
convicted of its violation; and that the judgment must be af-
firmed."

In the case of Munn *v.* Illinois, 94 U. S. 113 (24 L. ed. 77),
the question to be determined was whether the General Assembly
of Illinois could, under the limitations upon the legislative power
of the States imposed by the constitution of the United States, fix
by law the maximum of charges for the storage of grain in ware-
houses at Chicago and other places in the State having not less
than one hundred thousand inhabitants, "in which grain is stored
in bulk, and in which the grain of different owners is mixed to-
gether, or in which grain is stored in such a manner that the
identity of different lots or parcels can not be accurately pre-
served;" and in the discussion of the question the Supreme Court
of the United States said: "This brings us to inquire as to the
principles upon which this power of regulation rests, in order that
we may determine what is within and what without its operative
effect. Looking, then, to the common law, from whence came the
right which the constitution protects, we find that when private
property is 'affected with a public interest, it ceases to be *juris
privati* only.' This was said by Lord Chief Justice Hale more

than two hundred years ago, in his treatise *De Portibus Maris,*
1 Harg. Law Tracts, 78, and has been accepted without objection
as an essential element in the law ·of property ever since. Prop-
erty does become clothed with a public interest when used in a
manner to make it of public consequence, and affect the com-
munity at large. When, therefore, one devotes his property to a
use in which the public has an interest, he, in effect, grants to the
public an interest in that use, and must submit to be controlled
by the public for the common good, to the extent of the ·interest
he has thus created. He may withdraw his grant by discontinuing
the use; but, so long as he maintains the use, he must submit to
the control." See, in this connection, Budd *v.* New York, 143 U.
S. 517 (12 Sup. Ct. 468, 36 L. ed. 247). In the case of Wolff
Packing Co. *v.* Court of Industrial Relations, 262 U. S. 522 (43
Sup. Ct. 630, 67 L. ed. 1103, 27 A. L. R. 1280), the United States
Supreme Court said: "Whether the public has become so pecu-
liarly dependent on a particular business that the owner, by engag-
ing therein, subjects himself to intimate public regulation, must
be determined upon the facts of each case. The extent to which
a business which has become 'clothed with a public interest' may
be regulated depends upon the nature of the business, its relations
to the public, and the abuses reasonably to be feared."

In the case of *Loughbridge* v. *Harris,* 42 *Ga.* 500, it was dis-
tinctly recognized that while the right of eminent domain could
not be exercised by a company or individual erecting a mill and
a mill-dam, nevertheless a mill had some of the attributes of pub-
lic use and could be regulated by law for certain defined purposes.
The court said, in the opinion: "We do not think a mill, al-
though it has some of the attributes of public use, and is regulated
by law for certain defined purposes, can be regarded *such public
use* as the constitution recognizes, to authorize the exercise of
this great constitutional power" (the right of eminent domain).
Slaughter-houses are subject to sanitary regulation. Civil Code,
§ 2119 (a-h). In the case of Wartman *v.* City of Philadelphia,
33 Pa. 202, it was said: "A municipal corporation comprising a
town of any considerable magnitude, without a public market sub-
ject to the regulation of its own local authorities, would be an
anomaly which at present, has no existence among us. The State
might undoubtedly withhold from a town or a·city the right to

regulate its markets, but to do so would be an act of mere tyranny, and a gross violation of the principle, universally conceded to be just, that every community, whether large or small, should be permitted to control, in their own way, all those things which concern nobody but themselves. The daily supply of food to the people of a city is emphatically their own affair." "The slaughter within the city of animals for food, and particularly the houses and equipments for such purposes, are within the police regulation of a municipality. For the sake of public health and comfort, therefore, a municipality, in the exercise of its police power, may prescribe the character of buildings and equipment for slaughter-houses, and the limits within which they may be erected and maintained. So too, under the rules already given as to its authority over nuisances, the municipality may declare them nuisances, and entirely exclude them from the corporate boundaries." 28 Cyc. 730, 731. See, in connection with the text, the numerous authorities cited which bear directly upon the question now in hand. "The police power of the States may, in the absence of any constitutional restrictions on the subject, be delegated to the various municipalities throughout the State, to be exercised by them within their respective corporate limits, or even beyond where expressly authorized by statute or charter. Indeed such delegation is necessary, for it is a well-recognized principle in government that the police requirements of a city are different from those of the State at large, and that stricter regulations are essential to the good order and peace of a crowded metropolis than are required in the sparsely peopled portions of the country. It is not necessary that the police power should be granted to municipalities in express words, for by the organization of a city or borough within its borders the State imparts to its creature, the municipality, the powers necessary to the performance of its functions, and to the protection of its citizens in their persons and property, and the police power is one of these; and while it is no doubt competent for the legislature, in creating municipal corporations, to deprive them of all common-law police powers and enact that they shall possess and exercise such only as are conferred by statute, such intention of the legislature will not be inferred simply because some of the common-law powers are enumerated, while no mention is made of others. Statutes conferring the police power

on municipalities, however, should be so construed as not to authorize an unreasonable exercise thereof." 12 C. J. § 418. And likewise here we find many authorities supporting so much of the quotation from the text as is applicable to the question here involved. Some of the language in the portions of the text last quoted above from the works Corpus Juris and Cyc. is very broad, and we do not adopt it to its full extent; but in so far as applicable to the questions which we have before us in the instant case, the doctrine is sound as there stated.

In view of the strong reasons for upholding this ordinance and the decisions of numerous courts upholding similar ordinances, we are of the opinion that the decision of the Court of Appeals in this case is correct, and must be affirmed.

*Judgment affirmed. All the Justices concur, except Russell, C. J., who dissents.*